Bruce Fein (D.C. Bar #446615)
W. Bruce DelValle (FL Bar 779962; *pro hac vice* pending)
FEIN & DELVALLE PLLC
300 New Jersey Avenue, N.W., Suite 900
Washington, D.C. 20001
Telephone: (202) 465-8727
Facsimile: (202) 347-0130
bruce@feinpoints.com
DelValle@feindelvalle.com
Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Gary E. Johnson; Gary Johnson 2012, Inc. Libertarian National Committee; James P. Gray;  Green Party of the United States; Jill Stein; Jill Stein for President;** and, **Cheri Honkala,** | |
| Plaintiffs, | Honorable Judge: _____ |
| v. | Civil Action No. _____ |
| **Commission on Presidential Debates; Republican National Committee; Democratic National Committee; Frank J. Fahrenkopf, Jr.; Michael D. McCurry; Barack Obama;** and, **Willard Mitt Romney,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

---

## COMPLAINT

Plaintiffs Gary E. Johnson ("Johnson"), Gary Johnson 2012, Inc. ("GJ 2012"),

Libertarian National Committee ("LNC"), James P. Gray ("Gray"), Green Party of the United

States ("Green Party"), Jill Stein ("Stein"), Jill Stein For President ("Stein Committee") and

Cheri Lynn Honkala ("Honkala") hereby complain against Defendants Commission on

Presidential Debates ("the Commission"), Republican National Committee ("RNC"), Democratic National Committee ("DNC"), Frank J. Fahrenkopf, Jr. ("Fahrenkopf"), Michael D. McCurry ("McCurry"), Barack Obama ("Obama"), and Willard Mitt Romney ("Romney"), seeking equitable relief and an award for treble and other damages, and demanding trial by jury of the matters triable by jury, allege as follows:

## NATURE OF THE ACTION

1.     This action challenges a per se continuing illegal conspiracy or agreement between the RNC, the DNC, and the Commission, with the direction, assistance, and collusion, over the course of many years, of several co-conspirators and affiliated persons, including Fahrenkopf, McCurry, Obama, Romney, and other presidential candidates of the Republican and Democratic Parties.   The conspiracy commenced prior to the formation of the Commission, and no Defendant has withdrawn or abandoned it.   The overall objective was and continues to be the entrenchment market power in the presidential debates market, the presidential campaign market, and the electoral politics market of the two major political parties by exercising duopoly control over presidential and vice presidential debates in general election campaigns for the presidency. That objective was achieved in 2012 when the individual Plaintiffs were arbitrarily excluded substantially because of hostility towards their political viewpoints from presidential and vice presidential debates between the nominees of the two major parties organized and conducted by Defendants on October 3, 2012, October 11, 2012, October 16, 2012, and October 22, 2012, respectively.

2.     The continuing unlawful agreement seeks several illicit ends.

3.     The first is to acquire, maintain, and exercise duopoly control of the multi-million dollar market in organizing, promoting, sponsoring, and fundraising for holding general election presidential and vice-presidential debates to artificially advantage the Democratic and Republican Party candidates, to exclude all rival candidates, and to impair competition in the marketplace of ideas and the marketplace of the candidates themselves.  These debates are broadcast nationally on television and radio by major broadcasters, command huge audiences, and constitute a cognizable "presidential debates market" under federal antitrust laws.

4.     The second illicit end is to acquire, maintain, and exercise duopoly control over, and to exclude and severely undermine competition in, the multi-billion dollar market of organizing, promoting, fundraising for, and engaging in general presidential and vice-presidential election campaigns.  The business of campaigning for the presidency and vice-presidency constitutes a cognizable "presidential elections market" for purposes of the antitrust laws.

5.     The third illicit end is to acquire, maintain, and exercise duopoly control over, and to exclude and severely undermine competition in, the multi-billion dollar market in organizing, promoting, fundraising for, and engaging in political election campaigns throughout the nation at the federal, state, and local levels.  This business constitutes a cognizable "political campaign market" for purposes of the antitrust laws.

6.     A fourth illicit end is to narrow *de facto* voting choices in general presidential and vice presidential elections to the nominees of the two major parties and their views at the expense of a fair, evenhanded and informative electoral process that would include serious third party or independent candidates.

7.     Additional illicit ends are to exclude all others, including previous or arguably neutral campaign debate sponsors such as the League of Women Voters and the Citizens' Debate Commission, from organizing, promoting, sponsoring, and holding general election presidential and vice-presidential debates broadcast on television and radio by major national broadcasting companies ("presidential debates"); to prohibit and exclude all presidential candidates excepting the candidates of the two major parties from participating in the presidential debates, which is an "essential facility" to a viable presidential campaign; and, to stymie or prevent the growth of a political party that could meaningfully challenge the stranglehold of the two major parties on the United States electoral system at every level of government, which is itself a multi-billion dollar cognizable political campaign market controlled by a Republican and Democratic Party duopoly and exercised for anti-competitive purposes.

8.     This action challenges the per se illegal continuing horizontal boycott of Plaintiffs by the RNC and the DNC, utilizing their jointly created and maintained Commission, as the barrier to entry in each of the above-referenced cognizable markets.  The boycott has been conceived and executed with the direction, assistance, and collusion, over the course of many years, of several co-conspirators and affiliated people, including Fahrenkopf, McCurry, Obama, Romney, and other presidential candidates of the Republican and Democratic Parties.

9.     This conspiracy or agreement among Defendants violates the antitrust laws, the First Amendment, and District of Columbia tort law.  It excludes from presidential debates (1) presidential candidates other than the nominees of the Republican and Democratic Parties (the "duopoly nominees") unless the latter agree otherwise; and (2) of other sponsors such as the Citizens' Debate Commission, which has sought to organize, promote, sponsor, and hold the

presidential debates, and the League of Women Voters, which has organized, promoted, sponsored, and held presidential debates in the past but has been prevented from doing so since 1987 by the RNC, DNC, the Commission and those who have directed, assisted, and colluded with them.

10.     This action challenges the per se illegal continuing conspiracy between the RNC, DNC, and the Commission, with the direction, assistance, and collusion of several co-conspirators and affiliated people over the course of many years, including Defendants Fahrenkopf, McCurry, Obama, Romney, and other presidential candidates of the Republican and Democratic Parties with the purpose of restraining trade in the organizing, promoting, sponsoring, and holding of presidential debates through the creation and maintenance of the Commission, a joint venture of the RNC and the DNC.  The Commission, the RNC, and DNC have succeeded in monopolizing the market in organizing, promoting, sponsoring, fundraising for, and holding presidential debates; in monopolizing the market in organizing, promoting, fundraising for, and engaging in presidential election campaigns; and, in monopolizing the national political elections market to entrench the Republican and Democratic Parties.

11.     This action challenges Defendants' illegal continuing monopolization of, attempt to monopolize, and conspiracy to monopolize (a) the presidential debates market; (b) the presidential elections market; (c) the presidential candidates market; and, (c) the electoral politics market, in violation of Section 2 of the Sherman Act.

12.     This action challenges under the First Amendment the unreasonable limitation imposed by Defendants, including the Commission, the RNC, and the DNC, on the opportunity of third party or independent presidential or vice presidential candidates to participate in presidential

debates organized, sponsored, and conducted by them as an integral part of presidential elections despite their ballot qualifications in sufficient states to win an electoral-college majority.

13.     Plaintiffs seek recovery of treble damages based on their losses proximately caused by Defendants' violations of Sections 1 and 2 of the Sherman Act; equitable relief, including dissolution of the  Commission, and an injunction against further barriers, boycotts or other agreements that would either unlawfully restrain trade, would violate the First Amendment, or would violate District of Columbia tort law by precipitating the exclusion from presidential debates of presidential candidates who have obtained ballot access in a sufficient number of states to win an electoral-college majority.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. 1337(a); and, 28 U.S.C. § 1367. Plaintiffs' claims arise under the United States Constitution, the Sherman Act and the laws of the District of Columbia.  Plaintiffs seek monetary damages, costs, and attorneys' fees under, inter alia, 15 U.S.C. §15(a), 15 U.S.C. §26.   This Court has personal jurisdiction over the Commission, RNC, and DNC because they are inhabitants, are found, transact business, and have their principal places of business, in the District of Columbia.  Further, the actions of the Commission, the RNC, and the DNC giving rise to the claims herein occurred in the District of Columbia.  This Court has personal jurisdiction over Obama because he is an inhabitant, is found, transacts business, and has his principal place of business in the District of Columbia.  This Court has personal jurisdiction over Romney because he transacts, and has transacted, business, and his actions giving rise to the claims herein occurred, in the District of Columbia.  This Court has personal jurisdiction over Fahrenkopf and

McCurry because their principal places of business in their capacities as Co-Chairs of the Commission are, and their actions giving rise to the claims herein occurred, in the District of Columbia.

15.     Venue is proper in this Court as to the Commission pursuant to 15 U.S.C. §§ 22 and 28 U.S.C. §1391 (c).  Venue is proper in this Court as to all Defendants pursuant to 28 U.S.C. §1391 (b) because a substantial part of the events giving rise to the claims herein occurred in the District of Columbia.  Also, the RNC, the DNC, and the Commission are found in the District of Columbia.

## PARTIES

### A.     <u>Plaintiffs</u>

16.     The Libertarian National Committee controls and manages the affairs and resources of the United States Libertarian Party, the nation's third largest political party.  Founded in 1971, the Libertarian Party has nominated presidential candidates during every presidential election since its formation, including Ed Clark in 1980, who appeared on the ballots in all states and the District of Columbia; David Bergland in 1984, who received the third greatest number of votes in the presidential election; Ron Paul in 1988, who was on the ballot in 46 states and the District of Columbia and received the third most votes in the presidential election; Andre Marron in 1992, who was on the ballot in every state and the District of Columbia; Harry Browne in 1996, who was on the ballot in every state and the District of Columbia – the first time in history a "third party" earned ballot status in all 50 states and the District of Columbia in successive presidential elections; Harry Browne again in 2000, who headed a ticket of 1,436 Libertarian Party candidates, including 256 candidates for the U.S. House of Representatives; Michael

Badnanik in 2004, who was on the ballot in 48 states; Bob Barr in 2008, who led a ticket in an election in which fifty Libertarians were elected or re-elected; and Co-Plaintiff Gary Johnson in 2012, who received 1,275,951 votes, in an election during which six of the Libertarian Party candidates for office also received collectively in excess of one million votes.

17.      The Green Party of the United States was created from citizen concern with, among other things, ecology, civil rights, and peace.  Ralph Nader was the presidential candidate of several state Green Party organizations in 1996, with a self-imposed campaign spending limit of $5,000. The Association of State Green Parties (which changed its name to the Green Party of the United States in 2001) nominated Ralph Nader to be its presidential candidate again in 2000, when he received 2,833,105 votes (2.7 percent of all votes cast).  In 2004, the Green Party's presidential candidate was David Cobb, who earned ballot access in 28 states.  The Green Party presidential candidate in 2008 was former six-term Congresswoman Cynthia McKinney, who achieved ballot access in 31 states and the District of Columbia, which collectively comprised more than 70% of popular votes and 68% of electoral votes.  In 2012, the Green Party presidential candidate, Jill Stein, was the second (after Ralph Nader in 2000) to qualify for matching funds from the Federal Election Commission and qualified for  ballots in 36 states and the District of Columbia, representing 81.6% of the electoral votes.  Plaintiff Stein was denied inclusion in the 2012 presidential debates by the Commission, and dint of agreements between Romney, Obama, and their agents.  Notwithstanding the exclusion, Stein received 0.36% of the popular vote.

18.      Gary E. Johnson was twice elected Governor of New Mexico.  He was the Libertarian Party candidate for president in 2012.  Plaintiff Johnson was denied inclusion in the 2012 presidential debates.  Notwithstanding the denial, Johnson attracted more than 1.2 million votes,

the high-water mark for a Libertarian Party candidate.   He participated in two Republican primary election debates during the 2012 campaign.   After the second, he ranked first among participants in Google searches.   Johnson was excluded from all three 2012 general election presidential debates by the Commission and by agreements between Romney, Obama, and their agents held on October 3, 16, and 22, respectively.

19.     Jill Stein is a physician and environmental health advocate.   She was the Green Party candidate for president in 2012.   She received federal matching funds for her campaign, yet was excluded by the Commission, and by the Democratic and Republican presidential candidates from participating in the general election presidential debates on October 3, 16, and 22, respectively.   She qualified for the ballot in 36 states and the District of Columbia.   Stein debated in the 2002 campaign for Massachusetts governor against, among others, Mitt Romney.   *The Boston Globe* referred to her as "the only adult in the room."

20.     James P. Gray, a former Judge of the Superior Court of Orange County, California, was the 2012 Libertarian Party vice-presidential nominee and running mate of Johnson.   Gray was excluded from the debate between vice-presidential candidates Paul Ryan and Joe Biden on October 11 because of the policies, practices, and agreement by and between the Commission, RNC, and DNC and the Republican and Democratic presidential candidates, Mitt Romney and Barack Obama.

21.     Cheri Honkala, an anti-poverty advocate, was the 2012 Green Party vice-presidential nominee and running mate of Stein.   Honkala was excluded from the debate between vice-presidential candidates Paul Ryan and Joe Biden on October 11 because of the policies,

practices, and agreement by and between the Commission, RNC, and DNC and the Republican and Democratic presidential candidates, Mitt Romney and Barack Obama.

22.     Gary Johnson 2012, Inc. is a corporation that served as the campaign committee for Johnson-Gray campaign for president and vice-president in 2012.  The committee was responsible for raising campaign funds, paying campaign bills, and accounting for campaign revenues and expenses.

23.     Jill Stein for President is the entity that served as the campaign committee for Stein and Honkala's campaign (the "Stein/Honkala Campaign") for president and vice-president in 2012. The committee was responsible for raising campaign funds, paying campaign bills, and accounting for campaign revenues and expenses.

## B.     **Defendants**

24.     The Commission on Presidential Debates is a District of Columbia corporation that, despite its founding by the RNC and DNC, has received status as a 501(c) (3) non-profit organization by the Internal Revenue Service.  Its stated purpose is to make nationally televised general election presidential debates a bipartisan instrument solely in the control of the Republican and Democratic parties.   Since hijacking the presidential and vice-presidential debates from the independent, non-partisan League of Women Voters in 1988, the Commission has been the exclusive entity for organizing, overseeing, and conducting the nationally televised presidential and vice-presidential debates.  The Commission follows the dictates of the RNC and DNC and the presidential nominees of the Republican and Democratic parties (the "duopoly parties").

25.     The Republican National Committee is a national political committee that develops and promotes the Republican Party political platform and coordinates fundraising and campaign strategies for Republican Party candidates.   The RNC, with the assistance and collusion of others, created and sustains the Commission.  Instructed by the RNC and DNC, the Commission has exclusively organized and conducted the nationally televised presidential and vice-presidential debates since 1988 and excluded debate participants other than those chosen and approved by the RNC, DNC, and the Republican and Democratic presidential candidates.

26.     The Democratic National Committee is a national political committee that develops and promotes the Democratic Party political platform and coordinates fundraising and campaign strategies for Democratic Party candidates.   The DNC, with the assistance and collusion of others, created and sustains the Commission.   At the instruction of the RNC and DNC, the Commission has exclusively organized and conducted the presidential and vice-presidential debates since 1988 and excluded debate participants other than those chosen and approved by the RNC, DNC, and the Republican and Democratic presidential candidates.

27.     Frank J. Fahrenkopf, a former chair or co-chair of the RNC (from 1983-1989), was a founder of the Commission.  Mr. Fahrenkopf and the chair of the DNC agreed that the RNC and DNC should collaborate to wrench the presidential and vice-presidential debates from the independent, non-partisan League of Women Voters.  That agreement was ratified by the RNC and DNC in 1985.  Since that time, the RNC, DNC, and the duopoly nominees have dictated all of the terms and conditions relating to presidential and vice-presidential debates.  They include qualifications for participation, and a prohibition on either of the duopoly nominees from appearing on television or radio with any other candidate.  Fahrenkopf has been a co-chair of the

Commission from its founding until the present, and currently serves as co-chair with Michael D. McCurry.

28.     Michael D. McCurry is a former press secretary for the Clinton Administration.  He has been a member of the Board of Directors of the Commission.  At present, McCurry is co-Chair. He actively participates in the monopoly arrangement between the Commission, the RNC, the DNC, and the Republican and Democratic candidates for president to exclude all others from participating in the presidential and vice-presidential debates.

29.     Barack Obama is at present the President of the United States. He was the Democratic Party candidate for president in 2008 and 2012.  Individually, and through at least one agent, Robert Bauer,[1] Obama entered into collusive agreements during both campaigns that were intended to and succeeded in sustaining the monopoly of the Commission in organizing and conducting general election presidential and vice-presidential debates.  The agreements excluded from participation all candidates other than the Republican and Democratic nominees, and prohibited either of the duopoly nominees from even appearing on television or radio with any other candidate.

30.     Mitt Romney is a former Governor of Massachusetts.  He was the Republican Party candidate for president in 2012.  Individually, and through at least one agent, Ben Ginsberg,[2] Romney entered into collusive agreements during his campaign that were intended to and succeeded in sustaining the monopoly of the Commission in organizing and conducting the general election presidential and vice-presidential debates.   The agreements exclude from

_____

[1] Memo of Understanding, 2012, see attached Exhibit "1".
[2] Memo of Understanding, 2012, see attached Exhibit "1".

participation candidates other than the Republican and Democratic nominees, and prohibit either

of the duopoly nominees from even appearing on television or radio with any other candidate.

## FIRST CLAIM FOR RELIEF

COMBINATION AND CONSPIRACY TO RESTRAIN INTERSTATE COMMERCE IN
VIOLATION OF SECTION 1 OF THE SHERMAN ACT

31.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if they were fully

set forth herein.

32.     Commerce in the national presidential debates market, the presidential campaign market,

and the political elections market is substantial.

33.     The Defendants' illegal conduct in connection with each of these markets affects

interstate commerce, among other things, in the numerous ways.

34.     The publicity and exposure to the general public throughout the United States provided to

participating candidates in the presidential and vice-presidential debates has a monetary value of

hundreds of millions of dollars.  For instance:

      a.     In 1960, between 70[3] and 73.5[4] million people viewed the first televised

      presidential debate, between John F. Kennedy and Richard M. Nixon, with

      persons in two-thirds of the nation's 45 million television households (88% of all

      households[5]) watching.[6]

---

[3] "The Kennedy-Nixon Presidential Debates," Museum of Broadcast Communications
Encyclopedia of Television, http://www.museum.tv/eotv/kennedy-nixon.htm
[4] *Minow and LaMay, Inside the Presidential Debates, Introduction*
[5] George Farah, *No Debate*, p. 4.
[6] *Minow and LaMay, Inside the Presidential Debates, Introduction*

b.      More than 115 million persons in the United States watched or listened to at least some part of the four 1960 presidential debates.[7]

c.      Between 62.7 million and 69.7 million people viewed the three presidential debates in 1976 (between President Gerald R. Ford and Jimmy Carter), with 47.8-53.5% of households engaged.[8]

d.      The debate between independent candidate, John Anderson, and Ronald Reagan, in which President Carter refused to participate, was viewed by 55 million persons.[9]

e.      80.6 million people viewed the one debate in 1980 between President Carter and Ronald Reagan, with 58.9% of households engaged.[10]

f.      The first and second debates in 1984 between President Reagan and Walter Mondale attracted audiences of 65.1 million, and 67.3 million, respectively.[11]

g.      The first and second debates in 1988 between George H.W. Bush and Michael Dukakis also attracted audiences of 65.1 million and 67.3 million, respectively.[12]

---

[7] *Minow and LaMay, Inside the Presidential Debates, Introduction*
[8] Nielsen – "Highest Rated Presidential Debates 1960 to Present (10-06-2008)
[9] Jim Mason, *No Holding Back: The 1980 John B. Anderson Presidential Campaign*, p. 390.
[10] Nielsen – "Highest Rated Presidential Debates 1960 to Present (10-06-2008)
[11] Nielsen - "Highest Rated Presidential Debates 1960 to Present (10-06-2008)
[12] Nielsen - "Highest Rated Presidential Debates 1960 to Present (10-06-2008)

h.      The three 1992 presidential debates, which included William Jefferson Clinton, Ross Perot, and George H.W. Bush attracted 62.4 million[13], 69.9 million[14], and 66.9 million viewers, respectively.[15]

i.      In the 1996 race between President William Jefferson Clinton and Bob Dole, the presidential debates audience dwindled to 46.1 million and 36.3 million, respectively, for the first and second debates.  They excluded Ross Perot by agreement between the Commission and the major party nominees.

j.      In the 2000 campaign between Al Gore and George W. Bush, when the Commission and the major party nominees blocked the inclusion of Ralph Nader and Patrick Buchanan, only  46.6 million, 37.5 million and 37.7 million people viewed the first, second, and third debates, respectively.[16]

k.      The first, second, and third presidential debates in 2004 between President George W. Bush and John Kerry attracted audiences of 62.4 million, 46.7 million, and 51.1 million, respectively.[17]

l.      In the 2008 race between Barack Obama and John McCain, the three presidential debates garnered 52.4 million, 63.2 million, and 56.5 million viewers, respectively.[18]

---

[13] Commission on Presidential Debates – Debate history
www.debates.org/index.php?page=debate-history
[14] Nielsen - "Highest Rated Presidential Debates 1960 to Present (10-06-2008)
[15] Nielsen - "Highest Rated Presidential Debates 1960 to Present (10-06-2008)
[16] Commission on Presidential Debates – Debate history
www.debates.org/index.php?page=debate-history
[17] Commission on Presidential Debates – Debate history
www.debates.org/index.php?page=debate-history

m.      The three debates in 2012 between President Obama and Mitt Romney,

which excluded Plaintiffs Johnson and Stein by agreement between the

Commission, the RNC, the DNC, and the major party nominees, attracted 67.2

million, 65.6 million and 59.2 million viewers, respectively.[19]

35.    The corporate sponsors of the presidential debates collectively contribute millions of

dollars each election cycle to the Commission.  It received $6.8 million in 2007 and 2008, and

spent $2.3 million in 2008.  In 2012, the "National Debate Sponsors" who funded the

Commission's activities included Anheuser-Busch Companies, The Howard G. Buffett

Foundation, Sheldon S. Cohen (past I.R.S. Commissioner), Crowell & Moring LLP (a law firm),

International Bottled Water Association, The Kovler Fund, and Southwest Airlines.  They

collectively donated millions of dollars to the Commission, and some piggy-backed on the

debates to promote their products or to lobby for public policies that would benefit them.

36.    Debate sites throughout the United States have become "corporate carnivals" where

sponsors provide their marketing and lobbying materials and products to journalists and

politicians.[20]  In 2012, three original corporate sponsors – Philips Electronics, BBH New York (a

British advertising firm), and the YWCA – withdrew after supporters of Johnson, Stein, and

other "third-party" or independent candidates pushed for their debate inclusion without result.[21]

---

[18] Commission on Presidential Debates – Debate history
www.debates.org/index.php?page=debate-history
[19] Commission on Presidential Debates – Debate history
www.debates.org/index.php?page=debate-history
[20] "Deterring Democracy," under heading "Corporate Sponsorship."
[21] Harrison Wills, "Debate Commission's Own Hot Topic," October 2, 2012

37.     The presidential debates generate millions of dollars of revenues for communities and

universities where they are held:

      a.  The final presidential debate in 2012 was hosted by Lynn University.  That debate

           yielded $13.1 million in immediate economic impact for the Palm Beach County

           economy, including approximately $1.7 million in increased spending by local

           residents, more than $63 million in publicity value for Lynn University and the

           community, and an increase of 22% in bed taxes.  Spending in the area by

           delegates and members of the news media from every state in the country was

           almost $3 million.  The 4,060 members of the media who traveled to the

           community to cover the debate spent an estimated $2,662,000, which included

           lodging expenses of an estimated $655,000.  The publicity value of 33,208 news

           stories and total news circulation of 348,395,606 was estimated at $63,724,378.[22]

      b.  It was projected that the Denver area could realize $10-15 million in positive

           direct, tangible economic impact from Denver University hosting the first 2012

           presidential debate, including jobs for construction and maintenance crews

           building media risers, fences, scaffolding and other facilities, and increases in

           hotel and restaurant revenues.[23]  In addition, Denver University estimated a

---

[22] "Lynn's debate produced millions in positive economic impact and publicity"
http://www.lynn.edu/about-lynn/news-and-events/news/lynn2019s-debate-produced-millions-in-
positive-economic-impact-and-publicity-for-the-community
[23] "Denver debate's economic estimates vary; will it be $10M? $15M?," Sept. 28, 2012 – Denver
Business Journal http://www.bizjournals.com/denver/print-edition/2012/09/28/debates-
economic-estimates-vary-will.html?page=all

fifteen percent (15%) increase in student applications in 2013 due to exposure of
the university in connection with the debate.[24]

c.   After hosting the presidential debate for the first time in 2008, Hofstra University
witnessed more than an 11 percent increase in applicants.[25]

d.   Centre College in Danville, Kentucky, experienced a surge of 20 percent more
applicants following its hosting of a vice-presidential debate in 2000,[26] and a
substantial increase in alumni donations following its hosting of the 2012 vice-
presidential debate.  According to firms contracted by Centre College, the media
hits related to the 2012 vice-presidential debate were valued at $53,025,372.32.[27]

38.     Hosts of the presidential debates, and the municipalities and states in which they are
located, spend several millions of dollars in associated direct and indirect costs, including
payments of millions of dollars to the Commission.  For instance, in connection with hosting the
first 2012 presidential debate, Denver University paid $1.65 million to the Commission; the
Colorado Department of Transportation estimated it would spend $30,000-40,000 on traffic
control and barricades to direct traffic; and the City of Denver incurred substantial expenses,
including additional policing costs.[28]  According to Defendant McCurry, for a university to host

---

[24] "DU spent $1.6 million on debate, local governments also putting money,"
http://www.thedenverchannel.com/news/call7-investigators/du-spent-16-million-on-debate-local-governments-also-putting-money
[25] http://www.nytimes.com/2012/10/16/education/presidential-debates-raise-hofstra-universitys-image.html?_r=0
[26] http://www.nytimes.com/2012/10/16/education/presidential-debates-raise-hofstra-universitys-image.html?_r=0
[27] https://www.centre.edu/centre-college-calculates-media-value-of-vice-presidential-debate/
[28] "DU spent $1.6 million on debate, local governments also putting money,"
http://www.thedenverchannel.com/news/call7-investigators/du-spent-16-million-on-debate-local-governments-also-putting-money

a presidential debate, "the financial commitment the school makes is a minimum of $1.5

million," which goes to the Commission for production fees.[29]  Centre College spent about $3.3

million to host the 2012 vice-presidential debate.[30]  Hofstra University spent $4.5 million to host

a 2012 presidential debate.[31]  Lynn University paid $5 million.[32]

39.     The commerce in the presidential elections, presidential candidates and political elections

markets with a nexus to Defendants' illegal conduct substantially affects interstate commerce.

40.     The aggregate sum spent on the 2012 presidential election (during the 2012 election

cycle) was $2,621,415,792[33], which includes money spent by the campaigns and third parties.

Expenditures by both campaigns were made in all 50 states.   The Obama campaign spent $553.2

million, the DNC spent $263.2 million, and the largest Obama Super PACs spent $58 million.[34]

The Romney campaign spent $360.4 million, the RNC spent $284 million, and Super PACs

---

[29] "Why Most Colleges Don't Want to Host a Presidential Debate," 10-22-12
http://www.thedailybeast.com/articles/2012/10/22/why-most-colleges-don-t-want-to-host-a-presidential-debate.html
[30] "Why Most Colleges Don't Want to Host a Presidential Debate," 20-22-12
http://www.thedailybeast.com/articles/2012/10/22/why-most-colleges-don-t-want-to-host-a-presidential-debate.html; "Presidential Debate College Hosts See High Costs, Greater
Recognition," http://www.huffingtonpost.com/2012/10/22/presidential-debate-college-lynn-university_n_2000513.html
[31] "Why Most Colleges Don't Want to Host a Presidential Debate," 20-22-12
http://www.thedailybeast.com/articles/2012/10/22/why-most-colleges-don-t-want-to-host-a-presidential-debate.html; "Presidential Debate College Hosts See High Costs, Greater
Recognition," http://www.huffingtonpost.com/2012/10/22/presidential-debate-college-lynn-university_n_2000513.html
[32] "Presidential Debate College Hosts See High Costs, Greater Recognition,"
http://www.huffingtonpost.com/2012/10/22/presidential-debate-college-lynn-university_n_2000513.html
[33] "The Money Behind the Elections," https://www.opensecrets.org/bigpicture/
[34] John Hudson, "The Most Expensive Election in History by the Numbers,"
http://www.thewire.com/politics/2012/11/most-expensive-election-history-numbers/58745/

supporting Romney spent $200 million.[35]  During the 2012 campaign, more than one million

television ads were purchased by the Obama and Romney campaigns and their supporters.[36]

Combined, the Obama and Romney campaigns spent $78 million on online advertising

throughout the nation.[37]

41.     Republican and Democratic presidential candidate campaigns have enormous staffs

nationwide that are paid millions of dollars each month to work in the presidential electoral

campaign market.  In August 2012 alone, the Obama campaign spent $4.37 million on campaign

staff; and, the Romney campaign spent $4.04 million on staff payroll.  During August 2012, 901

persons were paid to work on the Obama campaign; and, 403 persons were on the Romney

campaign staff.[38]

42.     Commerce in the presidential elections, presidential candidates, presidential campaign

and electoral politics markets includes the intra-party and inter-party electoral competitions for

national office, which are largely and artificially limited to the duopoly parties under a "two-

party system" that continues to dominate the markets and results in the exclusion of other parties

or independents.  The duopoly control of the markets in electoral politics has been achieved and

fortified by the Commission not through talent, better ideas, success in achieving stated goals,

the aspirations of the voters, or efficiencies, but through anti-competitive measures, including

---

[35] John Hudson, "The Most Expensive Election in History by the Numbers,"
http://www.thewire.com/politics/2012/11/most-expensive-election-history-numbers/58745/
[36] John Hudson, "The Most Expensive Election in History by the Numbers,"
http://www.thewire.com/politics/2012/11/most-expensive-election-history-numbers/58745/
[37] John Hudson, "The Most Expensive Election in History by the Numbers,"
http://www.thewire.com/politics/2012/11/most-expensive-election-history-numbers/58745/
[38] Matt Gold, "Obama campaign had twice the staff as Romney last month at same cost," The
Los Angeles Times, September 24, 2012

control of the presidential debates by the duopoly parties and the Commission for the sole and exclusive benefit of the RNC and DNC.

43.     This control is exercised to block access to the debates for all other parties and candidates, notwithstanding that a majority of people in the United States support inclusion of some of those parties and candidates in the presidential debates, and the registration of a plurality of voters as independent according to a 2011 Gallop Poll.  (For instance, a 1996 poll showed that 76% of voters wished Ross Perot included in the debates.[39] A 2000 poll showed that 64% of registered voters wanted Ralph Nader and Patrick Buchanan included in the debates.[40])   The commerce in the presidential elections, presidential candidates, presidential campaign and electoral politics markets with a nexus to Defendants' illegal conduct in restraint of trade substantially affects interstate commerce.

44.     Billions of dollars are spent by and on behalf of the duopoly parties and their campaigns and candidates throughout the country, on everything ranging from tee-shirts, rental of office space, entertainment and conventions to advertising.  Since 1998, the persistently increasing costs of elections, spent almost entirely by or on behalf of the duopoly parties and their candidates has climbed from over $1.6 billion annually[41] to over $6.3 billion.[42]

45.     Televised presidential and vice-presidential debates have become "essential facilities" for any presidential or vice-presidential candidate seeking to (a) meaningfully compete for election to office; and/or (b) communicate his/her message to people throughout the United States in a

---

[39] http://articles.sun-sentinel.com/1996-09-20/news/9609200140_1_debate-commission-presidential-debates-state-ballots
[40] http://opendebates.org/theissue/15percent.html
[41] https://www.opensecrets.org/bigpicture/
[42] http://www.opensecrets.org/news/2013/03/the-2012-election-our-price-tag-fin/

way that may influence policies irrespective of candidate victory.  In 1992, Ross Perot made budget deficits a national issue through his participation in presidential debates permitted with the consent of the two major party candidates for ulterior motives.  Participation by presidential and vice-presidential candidates in televised presidential and vice-presidential debates is an "essential facility" to fund-raising, media exposure, ability to attract volunteers, name recognition, voter support, philosophical or ideological branding, and popular credibility or goodwill necessary to conduct the business of a meaningful presidential or vice presidential campaign.

John F. Kennedy attributed his election victory to his debates with Richard M. Nixon[43]. Jimmy Carter attributed his successful campaign in 1976 and his failed campaign in 1980 to his debate performances.[44]  When Ross Perot was allowed to debate the duopoly parties' presidential candidates in 1992, the extent of his public support almost tripled – from 7% in the polls to 19% of the vote.[45]  Although not on a presidential level, Jesse Ventura demonstrated the importance of debate inclusion when he won Minnesota's gubernatorial election after he participated in candidate debates.  Ventura's poll numbers were at 10% before being "permitted" to participate in the Minnesota gubernatorial election debates.

46.     To be excluded from the debates is "an electoral death sentence."[46] The media gives non-duopoly, non-major party candidates little or no coverage, and they cannot afford significant, if any, national advertising.  Hence, they are denied the free, enormous coverage received by the

---

[43] Farah, p 2.
[44] Farah, p 2.
[45] http://en.wikipedia.org/wiki/Ross_Perot
[46] Farah, p. 2, quoting Jamin Raskin, *Overruling Democracy*

duopoly party candidates through the debates,[47] and they are marginalized in the minds of most people in the U.S. and the media, and considered to be less than serious, peripheral, and perhaps even frivolous candidates.

47.     There are no alternative means for presidential and vice-presidential candidates to acquaint themselves to the American public that even approaches the exposure provided by the presidential debates.  Exclusion from the debates guarantees marginalization, a public perception that the excluded candidates are "unserious," notwithstanding their talent, records, capabilities, alignments with the views of many, if not most, of American voters, and leadership skills.

48.     Even if not victorious (although in 1860 Abraham Lincoln did win as a "third-party" candidate when he ran as a Republican against a Democrat and a Constitutional Union candidate), third-party candidates provided national media coverage equivalent to the candidates of the duopoly parties would exert a material influence on the political dialogue and, ultimately, on national policies.  For instance, after Ross Perot was allowed to debate Bill Clinton and George H.W. Bush in 1992, the national political dialogue became far more robust, particularly the issue of national deficits, which had previously been ignored. After Teddy Roosevelt ran as the candidate of the Progressive Party in 1912, many policies for which he aggressively advocated became law, including the direct election of senators, women's suffrage, the minimum wage, an eight-hour workday, unemployment insurance, and old-age pensions.[48]

49.     Cooptation and absorption by the duopoly parties of the positions of third-party candidates who have been able to get their message out to the U.S. public is a proven means of

---

[47] Bernard C. Barmann, "Third-Party Candidates and Presidential Debates: A Proposal to Increase Voter Participation in National Elections," Columbia Journal of Law and Social Problems (1990 Issue 23), p. 449.
[48] Thomas L. Friedman and Michael Mandelbaum, *That Used to Be Us,* p. 339.

bringing about constructive changes supported by a large segment of the population, including the enactment of the Sherman Act of 1890.  When those third-party candidates are marginalized and deprived of media coverage because they are not included in presidential debates, the capacity for such influence on important issues is dramatically diminished and public policy stagnates.

50.      During the entire history of televised presidential debates, only one third-party candidate – Ross Perot in 1992 -- has participated in debates with the two duopoly party candidates (and only with their permission coming with ulterior motives).  Only once has a third-party or independent candidate participated in a televised debate with one duopoly party candidate – in 1980.  The incumbent president, Jimmy Carter, refused to participate in a debate that would have included John Anderson, a popular independent candidate.  Anderson then debated Republican challenger Ronald Reagan under the aegis of the League of Women Voters.  In every other presidential debate, the duopoly party candidates and/or the sponsor/organizer of the debates has excluded anyone other than the duopoly party candidates from participation.

51.      The first nationally televised presidential debates occurred in 1960, when John F. Kennedy and Richard M. Nixon debated four times.  No presidential debates were held during the next three elections because of the refusal of one or both of the duopoly candidates to participate.  Beginning in 1976, the non-partisan, independent League of Women Voters organized and sponsored the presidential debates, until they were hijacked from the organization in 1988 by the Commission on Presidential Debates, the RNC, and the DNC.  The motivation for the hijacking was to endow the RNC, the DNC and their presidential candidates with complete control over the debates to entrench the two major parties and avoid situations as in 1980 when

the debate organizer (the League of Women Voters) independently required the inclusion of a

non-duopoly party candidate (John Anderson) despite the opposition of one of the duopoly party

candidates (President Carter)--even to the point of his refusal to participate in the debate.

Presidential debates have been held in every election since 1976.

52.      With a desire and intention to control the presidential debates, including the exclusion of

candidates other than the duopoly party candidates unless otherwise agreed by them, and to

exclude all other parties and their candidates from meaningful competition in presidential

elections, specifically, and, in the electoral politics market, generally, the RNC and DNC,

through their then-Chairpersons, Fahrenkopf and Paul Kirk, with the collusion of the 1988

duopoly party candidates, wrenched control over the presidential debates from the League  of

Women Voters .

53.      The DNC and RNC, through Fahrenkopf and Kirk, agreed to form the Commission, with

the intention and result of forcing the League of Women Voters out of the relevant markets,

notwithstanding its proven ability to organize and conduct presidential debates with a

nonpartisan, independent stance.

54.      The Commission is the alter ego of the RNC and the DNC.

55.      The Chairs of both the RNC and the DNC were the Co-Chairs of the Commission at its

inception.

56.      The Commission endorsed and supported the RNC and the DNC and their political

candidates in 2012 or otherwise.

57.      The Commission opposed the Plaintiffs, as candidates and as political parties; as well as

opposing any other non-RNC and non-DNC political party or candidate in 2012.

58.     The Commission structured the 2012 presidential debates to promote or advance the duopoly candidates, as a single monopolistic entity for purposes of these allegations, over any other candidates and nominees of other political parties, which included Plaintiffs.

59.     The admitted goal of the Commission at its birth was to create and maintain a monopoly, and sole control, over the presidential debates, and maintain monopoly control over the presidential debates market, the presidential elections market, and the electoral politics market. That conspiratorial objective has never been withdrawn or abandoned by the Commission.

60.     The Commission has succeeded not because of talent, leadership, effectiveness, efficiency, commitment to the public interest, or representation of the views or desires of the majority of U.S. voters, but because of the monopolistic lock maintained by the RNC, the DNC, and the Commission over presidential debates.  That power has been exercised to exclude debate participants other than candidates of the RNC and DNC duopoly parties, and to exclude non-partisan, independent organizers and sponsors of the presidential debates who would organize and implement the debates in the interest of the public rather than in the interest of maintaining the monopoly power of the duopoly parties and their corresponding interest in assuring that only the candidates of the duopoly parties are known, heard, and seen by voters.

61.     Continuously, since the earliest discussions between representatives of the RNC (particularly Fahrenkopf) and the DNC regarding the plan to solely control the presidential debates market, the DNC, RNC, Fahrenkopf, and, after its formation, the  Commission sought, through the control of the presidential debates market, to control the presidential elections market and the electoral politics market, and to exclude other parties and candidates from all three markets or to render them non-competitive.

62.     In 1984, Fahrenkopf, in unlawfully maneuvering to acquire control over the presidential debates with DNC Chair Charles Manatt, disclosed his duopoly motive: "I am a believer and I think chairman Manatt is that the two major political parties should do everything in their power to strengthen their own position.  We're party builders."[49]  In other words, the two aimed to employ their joint monopoly power through anti-competitive means to exclude others from presidential debates or their sponsorship, notwithstanding their talent, quality of leadership, effectiveness, efficiency, commitment to the public interest, or representation of the views or desires of a majority of voters.

63.     The monopolization purpose of maintaining the duopoly parties' control over the presidential debates market (later characterized as "joint appearances" in the 1985 agreement described below) through the formation of the monopolistic Commission was explicitly described in a written, judicially enforceable agreement ("Memorandum of Agreement on Presidential Candidate Joint Appearances) by Fahrenkopf and Paul Kirk in 1985, acting as chairs of their respective duopoly parties:

>    It is our *bi*partisan view that a primary responsibility of each major political party is to educate and inform the American electorate of its fundamental philosophy and policies as well as its candidates' positions on critical issues. One of the most effective means of fulfilling that responsibility is through nationally televised joint appearances conducted between the presidential and vice-presidential nominees of *the two major political parties* during general election campaigns. Therefore . . . future joint appearances should be *principally and jointly sponsored and conducted by the Republican and Democratic National Committees*. (Emphasis added.)[50]

---

[49] George Farah, *No Debate*, p. 28.
[50] Memorandum, http://opendebates.org/theissue/memo.jpg

64.     That 1985 memorandum was appended to a report of a group of Democratic and Republican representatives called "Commission on National Elections," which made clear the intention of the RNC and the DNC, and its representatives and agents, that the duopoly parties should wrest control of the presidential debates from the League of Women Voters.  That report suggests a conspiracy to illegally restrain trade in the presidential debates, presidential elections, and electoral politics markets in stating:

> The commission therefore urges the *two parties to assume responsibility for sponsoring and otherwise ensuring that presidential candidate joint appearances are made a permanent and integral part of the presidential election process*.  If they do so, the commission believes that the parties will strengthen both the process and *themselves*.[51] (Emphasis added.)

65.     In 1986, the DNC and RNC explicitly ratified an agreement between Fahrenkopf and Kirk "for the [two] parties to take over presidential debates."[52]

66.     Serving as chairs (or co-chairs) of their duopoly parties and concurrently as co-chairs of the Commission, Fahrenkopf stated that the Commission would not likely look favorably on including third-party candidates in the debates.  Kirk said the Commission should exclude third-party candidates from the presidential debates.[53]

67.     The exclusion of candidates other than those of the duopoly parties is and has been, since the formation of the Commission monopoly, intended to cement the two-party duopoly control of the Democratic and Republican parties in all relevant markets.  In 1987, the RNC and DNC issued a joint press release referring to the Commission as a "bipartisan, non-profit, tax-exempt

---

[51] Open Debates, "*Revealing History*,"
http://opendebates.org/theissue/strengthenmajorparties.html
[52] George Farah, *No Debate*, p. 30
[53] George Farah, *No Debate*, p. 30-31

organization formed to implement joint sponsorship of general election presidential and vice-presidential debates, starting in 1988, by the national Republican and Democratic committees between their respective nominees."[54] (Emphasis added.)  This joint press release expressed Fahrenkopf's and Kirk's intention to brandish the joint monopoly power of the Democratic and Republican parties to assert permanent, exclusive control over the presidential debates market. The two are quoted as follows: "We have no doubt that with the help of the Commission we can forge a permanent framework on which *all future* presidential debates between the nominees of the *two* political parties will be based."  (Emphasis added.)

68.     The RNC's and DNC's duopolistic control and, through the  Commission, the monopolistic restraint of trade in the presidential debates market, the presidential elections market, the presidential candidates market and the electoral politics market was further evidenced by the fact that Fahrenkopf and Paul Kirk, the chairs of the RNC and the DNC, respectively, also served as co-chairs of the  Commission.  The dual office holding guaranteed that the two major parties would exclusively control the Commission for the benefit of themselves and their candidates, and thereby monopolize the presidential debates market, the presidential elections market, and the electoral politics market, while excluding all others, including Plaintiffs.

69.     In 1988, the Commission and the League of Women Voters initially agreed that the former would sponsor the first presidential debate and the latter the second.  But when the Commission was presented with a Memorandum of Understanding secretly negotiated by the George H.W. Bush and Michael Dukakis campaigns dictating debate details, including the

---

[54] http://www.opendebates.org/theissue/the Commissionrelease.pdf

participants, the audience, and the format, the League of Women Voters withdrew. Its press release explained that the "demands of the two campaign organizations would perpetrate a fraud on the American voter…The League has no intention of becoming an accessory to the hoodwinking of the American people."[55]

70.     The Commission then became, and currently remains, the sole presidential debate sponsor, strengthening and maintaining its monopoly over the presidential debates in the service of its creators: the RNC, the DNC, and the two major party candidates. The duopoly nominees, with the aid and assistance of the RNC and DNC, in 1988 and from 1992 until the present, have conspired with the Commission to exclude from the presidential debates other candidates, notwithstanding their talent, leadership skills, effectiveness, efficiency, commitment to the public interest, or representation of the views or desires of a voting plurality or majority. The 1992 presidential race was an aberration. The two major party candidates permitted the participation of Ross Perot because both believed his presence would boost their respective presidential ambitions.

71.     During every year in which presidential debates are held, the duopoly party candidates or their designated agents meet secretly and negotiate a now standardized judicially enforceable written agreement, termed a "Memorandum of Understanding" ("Memo of Understanding"). Their purpose and effect are to unreasonably restrain commerce in the presidential debates market, the presidential elections market, and the electoral politics market. Among other things, the agreement customarily provides that the candidates will only debate each other and will not debate anyone else in any forum. An exception was made in 1992—despite the Commission's

---

[55] George Farah, *No Debate*, p. 33.

opposition--when the two major party candidates permitted the participation of Ross Perot because both believed his presence would enhance their respective prospects for victory.

72.     The agreements further provide that the candidates will cooperate only with the Commission and no other debate organizer or sponsor; that the candidates will refrain from appearing on any television or radio program with any other candidate; and, that the candidates will not issue any challenges for additional debates.

73.     In 2012, Obama and Romney, individually and through their agents, Robert Bauer and Ben Ginsberg, respectively, agreed in a judicially enforceable Memo of Understanding to an unreasonable restraint of trade and joint monopolization over the presidential debates market, the presidential elections market, and the electoral politics market.  See 2012 Memo of Understanding, attached hereto as Exhibit "1".  The objective was to exclude anyone other than Obama and Romney, including Plaintiffs Stein and Johnson, from the 2012 debates, and to exclude any debate organizers or sponsors other than the Commission.  The MOU provided:

1.  "The parties agree that they will not (1) issue any challenges for additional debates, (2) appear at any other debate or adversarial forums except as agreed to by the parties, or (3) accept any television or radio air time offers that involve a debate format or otherwise involve the simultaneous appearance of more than one candidate."

2.  "The Campaigns agree that the Commission [on Presidential Debates] shall sponsor the debates, subject to its expression of a willingness to employ the provisions of this agreement in conducting these debates."

3. "The parties agree that the Commission's Nonpartisan Candidate Selection Criteria for 2012 General Election Debate participation shall apply in determining the candidates to be invited to participate in these debates."

4. "If one or more candidates from campaigns other than the two (2) signatories are invited to participate pursuant to those Selection Criteria, those candidates shall be included in the debates, if those candidates accept the terms of this agreement."

74.     The Commission's three-part "Candidate Selection Criteria for 2012 General Election Debate", was designed and intended to exclude any candidate from participating in the 2012 presidential debates other than the nominees of the two major parties (Defendants DNC and RNC), notwithstanding the documented desires of most voters during prior presidential races and the registration of a plurality of voters as "Independents" (i.e., neither Republican nor Democrat) for additional participants:

1. <u>EVIDENCE OF CONSTITUTIONAL ELIGIBILITY</u>

The Commission's first criterion requires satisfaction of the eligibility requirements of Article II, Section 1 of the Constitution.  The requirements are satisfied if the candidate:

a. is at least 35 years of age;

b. is a natural born citizen of the United States and a resident of the United States for fourteen years; and

c. is otherwise eligible under the Constitution.

2. <u>EVIDENCE OF BALLOT ACCESS</u>

The Commission's second criterion requires that the candidate qualify to have his/her name appear on enough state ballots to have at least a mathematical chance of securing an Electoral College majority in the 2012 general election.  Under the Constitution, the candidate who receives a majority of votes in the Electoral College, at least 270 votes, is elected President regardless of the popular vote.

3. <u>INDICATORS OF ELECTORAL SUPPORT</u>

The Commission's third criterion requires that the candidate have a level of support of at least 15% (fifteen percent) of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly-reported results at the time of the determination.

75.     The third criterion, which requires support by at least 15% of the national electorate, as determined by five selected national public opinion polling organizations (the "15% polling criterion"), was arbitrarily and capriciously set by the  Commission, approved by the RNC and the DNC, and adopted by both Romney and Obama as part of their agreement in restraint of trade and to enable the  Commission, the RNC and the DNC to monopolize the presidential debates market, the presidential elections market, and the electoral politics market.

76.     The 15% polling criterion was set purposefully unreasonably high by Defendants solely to exclude the participation of any candidates or parties in the presidential debates market and the presidential elections market except for the two major party nominees and the two major parties, respectively.  It was understood, engineered and expected by Defendants that no candidate could ever reach a level of 15% national support in five national polls on the eve of the debates.

77.     Additionally, and further evidencing the anticompetitive motives of Defendants, the 15% polling criterion is facially flawed.  The pollsters may decline to identify a third party or independent candidate as a possible choice for poll respondents.  In that event, that candidate could never reach the polling benchmark irrespective of his popular support.

78.     There are no prescribed standards as regards polling methodologies and protocols to be utilized to determine the 15% polling criterion, such as the questions to be used and the choices to be presented to the respondents.  There are no standards for determining which organizations qualify as "national public opinion polling organizations," who is responsible for commissioning the polls, or whether a candidate could choose to rely on the best five national poll results if more are conducted.  In sum, a candidate is denied fair notice of what is type of national polling is required to satisfy the 15% polling criterion.  It invites manipulation by Defendants to exclude any third party or independent candidates from presidential debates.  None has ever satisfied the 15% polling criterion since its inception.

79.     In point of fact, Plaintiff Johnson polled far in excess of the 15% polling criterion in five (5) head-to-head 2012 national independent polls against Obama, yet was not permitted to participate in any of the 2012 presidential debates.

80.     Upon information and belief, Romney was permitted to participate in the 2012 presidential debates based solely upon satisfaction of the 15% polling criterion in similar head-to-head polling exclusively against Obama.  The identical head-to-head methodology was not employed by Defendants in denying Plaintiffs participation in presidential debates for failing the 15% polling criterion.

81.     The 15% polling criterion did not constitute a pre-established objective criterion to determine which candidates may participate in a presidential debate sponsored by the Commission.

82.     Additionally, in 2012, Plaintiffs Johnson and Stein attained ballot access in sufficient states to win an electoral-college majority, which ordinarily would require collecting approximately six hundred thousand (600,000) signatures from a broad spectrum of the electorate.

83.     Plaintiffs Stein, Honkala, Stein Committee and the Green Party also qualified for federal matching funds under the Federal Elections Campaign Act.  Plaintiffs Johnson and Stein, their running mates and their respective parties were nonetheless excluded from the 2012 presidential debates for failing the exclusionary, arbitrary and capricious and anti-competitive 15% polling criterion.

84.     Plaintiffs were denied fair notice of the terms and conditions of national public opinion polling that must be performed by five national public opinion organizations to satisfy the 15% polling criterion in 2012.

85.     By agreeing in their secret 2012 Memo of Understanding that the Commission's polling criterion would "apply in determining the candidates to be invited to participate in [the 2012 presidential] debates," Obama and Romney, in unlawful conspiracy and purposeful collusion with the Commission and the RNC and the DNC, guaranteed that the two would monopolize the three 2012 presidential debates and the three above-referenced cognizable antitrust markets.

86.     According to an empirical analysis by prominent experts in statistics, public opinion, and political strategy, the 15% polling criterion as applicable to non-head-to-head polls can

ordinarily be satisfied only by expending approximately $270 million to obtain necessary name

recognition-a staggering sum which underscores its exclusionary intent and effect in the

presidential debates market, the presidential campaign market, the electoral politics market.

87.     Obama and Romney also agreed in their Memo of Understanding to unreasonably

restrain trade and to monopolize the three relevant markets, by agreeing that any candidate who

might miraculously satisfy the 15% polling criterion would also be required to consent to the

exclusion of others either as debate participants or sponsors.

88.     The duopoly party candidates and their representatives set the judicially enforceable

terms of the debates, including the topics, locations, participants, moderators, format, and many

other details which are dutifully executed by the Commission, to unreasonably restrain trade and

to monopolize the above-referenced cognizable antitrust markets.

89.     Defendants have combined, contracted, colluded and conspired with each other to

unreasonably and substantially restrain interstate trade and commerce in the presidential debates

market, the presidential elections market, the presidential candidates market and the electoral

politics market in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

90.     As a direct and proximate result of the unlawful agreements and practices by and between

Defendants, Plaintiffs have been injured in their businesses of debating in presidential elections,

participating in presidential election campaigns, and engaging in electoral politics.  Plaintiffs

have been unfairly deprived of free competition in the presidential debates market, the

presidential elections market, and the electoral politics market and have lost millions of dollars in

publicity value and capacity to communicate their messages to the people of the United States;

millions of dollars in campaign contributions; millions of dollars in matching federal campaign

funds; and, in the case of the individual Plaintiffs, the salaries they would have received if elected to offices of President or Vice-President of the United States, respectively, in 2012.

91.     Defendants have denied Plaintiffs proper notice to enable them to comply with the arbitrary and capricious barriers to participation in the applicable markets, thereby making it impossible for Plaintiffs to avoid the monopolistic design, effect and impact of Defendants' actions and inactions set forth herein in violation of Section 1 of the Sherman Act, due process, and fundamental fairness.

92.     As a direct and proximate result of the Defendants' unlawful agreements and anticompetitive, exclusionary practices, Plaintiffs have suffered actual damages in an amount to be determined at trial, including, inter alia, loss of revenue, loss of profits, and increased costs.

## SECOND CLAIM FOR RELIEF

### MONOPOLIZATION, ATTEMPT TO MONOPOLIZE, AND CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

93.      Plaintiffs incorporate by reference each of the foregoing paragraphs as if they were fully set forth herein.

94.     The RNC and DNC have monopolized the presidential debates market, the presidential elections market, and the electoral politics markets through numerous anticompetitive practices.

95.     The RNC, DNC, and the Commission, with the collusion of the other named Defendants and others, have engaged in competitively unreasonable practices that have created a dangerous probability of monopolizing and have in fact monopolized the presidential debates market, the presidential elections market, and the electoral politics market.

96.     The RNC and DNC conspired to create and to control the Commission with the objective of jointly monopolizing the presidential debates market, the presidential elections market, and the electoral politics market.

97.     Through the creation, control, manipulation and maintenance of the Commission, the RNC, DNC, and the Commission have controlled and monopolized the presidential debates, to which access is an "essential facility" for Plaintiffs and others who wish to compete in the presidential debates market, the presidential elections market, and the electoral politics market.

98.     Participation in the debates has been, and is, an "essential facility" to the fund-raising, media exposure, ability to attract volunteers, name recognition, voter support, philosophical or ideological branding, and popular credibility or goodwill necessary to conduct the business of a meaningful presidential campaign.

99.     The monopolization by the RNC, DNC, and the Commission of every aspect of the presidential debates—an essential facility--obligated them to permit the participation of Plaintiffs Johnson and Stein in the 2012 election cycle on reasonable, nondiscriminatory terms and to abandon their exclusionary and unreasonably anti-competitive 15% polling criterion.

100.    Since 1988, the Commission, RNC, and DNC have exercised exclusive control of the presidential debates to the exclusion of all others.

101.    The Plaintiffs and others who seek to compete in the presidential debates are unable practically or reasonably to duplicate the essential presidential debates facility, particularly since the candidates of the duopoly parties invariably agree to refrain from debating or appearing on television or radio programs with any other candidates.

102.    The RNC, the DNC, the Commission, and the individual Defendants have denied

Plaintiffs and others access to the presidential debates and have denied others who have sought

to organize or sponsor presidential debates access to presidential debates, particularly through

the quadrennial Memos of Understanding entered into by candidates of the RNC and DNC

duopoly parties.  They stipulate that the two major party nominees will cooperate only with the

Commission in participating in presidential debates.  And the Commission slavishly accepts the

terms and conditions of the Memos of Understanding.

103.    Without creating a proverbial Tower of Babel, the RNC, DNC, and the Commission

could abandon the 15% polling criterion in favor of a less prohibitive presidential debates filter.

Applying the first two of the three criteria already set by the Commission for debate inclusion,

for instance, would limit debate participants other than the two major party nominees to a

manageable few.  In 1988, only two third-party candidates had sufficient ballot access to possess

a mathematical possibility of winning an electoral-college majority; in 1992, there were three; in

1996, four; in 2000, five; in 2004, four; in 2008, four; and in 2012, only two.[56]

104.    Defendants have monopolized the presidential debates market, the presidential elections

market, the presidential candidates market and the electoral politics market by acquiring,

maintaining and exercising power to (1) keep parties, candidates and their ideas divergent from

the duopoly parties out of meaningful electoral competition; (2) fix the terms and conditions of

presidential debates to avoid embarrassment or challenges to the two major party nominees; (3)

exclude competition in all the above-referenced cognizable antitrust markets; (4) exclude any

other entities or organizations, such as the independent and public-interest-promoting League of

---

[56] http://opendebates.org/theissue/15percent.html

Women Voters and the Citizens' Debate Commission, from organizing or sponsoring presidential debates; and (5) exclude candidates other than the nominees of the duopoly parties from participating in presidential debates.

105.    Defendants have intentionally and willfully conspired to monopolize the markets by way of the acts described herein. A substantial amount of interstate commerce has been affected by the attempt and conspiracy to monopolize and actual monopolization of the above-referenced antitrust markets.

106.    As a direct and proximate result of the unlawfully anticompetitive and exclusionary conduct by Defendants described herein, Plaintiffs have been injured in their businesses and property, including lost campaign contributions, volunteers, media exposure, name recognition, philosophical or ideological branding, voter support, and public credibility and valuable goodwill. Plaintiffs have been deprived of the benefits of free competition in the presidential debates market, the presidential elections market, and the electoral politics market, and have been injured by Defendants' refusals to deal with them, and incurred increased costs, decreased revenues, and the loss of valuable benefits possible only from participation in presidential debates.

107.    Defendants have denied Plaintiffs proper notice to enable them to comply with the arbitrary and capricious barriers to participation in the applicable markets, thereby making it impossible for Plaintiffs to avoid the monopolistic design, effect and impact of Defendants' actions and inactions set forth herein in violation of Section 2 of the Sherman Act, due process, and fundamental fairness.

108.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have

suffered actual damages in an amount to be determined at trial, including, inter alia, loss of

revenue, loss of profits, and increased costs.

### THIRD CLAIM FOR RELIEF

VIOLATION OF FIRST AMENDMENT RIGHTS OF FREE SPEECH AND ASSOCIATION

109.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if they were fully

set forth herein.

110.    The presidential debates organized by Defendants exert a *de facto* influence on the

outcome of presidential elections comparable to the influence of the Jaybird Party's organized

private club elections on Fort Bend, Texas, official county-wide elections recounted by the

United States Supreme Court in *Terry v. Adams,* 345 U.S. 461 (1953).

111.    Just as candidates who failed to prevail in the Jaybird Party's "private club" elections

were, in light of proven political realities, guaranteed to lose in official county-wide races, a

presidential candidate who is excluded from presidential debates has zero chance of winning the

general presidential election.  Indeed, it has never happened since presidential debates

commenced in 1960, more than a half-century ago.

112.    As an established political reality, presidential debates narrow the viable general

presidential candidates to the nominees of the two major parties, just as the Jaybird Party's

"private club" elections narrowed the number of viable candidates to county-side offices to one

— the Jaybird Party's nominee.

113.     Presidential debates organized and conducted by Defendants have become an integral part, indeed the predominant part, of the elective process that determines who will be President of the United States, the post powerful office in the nation and the world.

114.     The terms and conditions of presidential debates set forth in the Memos of Understanding between the two major party nominees are intended to be judicially enforceable, as were the racially restrictive covenants in *Shelley v. Kramer,* 334 U.S. 1 (1948).   The prospect of judicial enforcement power hangs like a Sword of Damocles to force adherence Memos of Understanding negotiated by the two major party nominees.

115.     Strict judicial scrutiny of those exclusionary terms and conditions is urgent because the political processes which ordinarily can be expected to redress popular grievances are skewed in favor of the two major parties and their candidates and against third parties or independents or their candidates.   Exemplary of the bipartisan legislative bias are political gerrymandering, the winner-takes-all rule, ballot access laws, and campaign finance laws.   All are geared to entrench the two major parties. The Republican and Democratic Members of Congress would scoff at any effort of Plaintiff's to redress their grievances though legislation that would undermine their own stranglehold on the multi-billion dollar business of politics.

116.     Thus, the Democracy in Presidential Debates Act (H.R. 791, 102nd Cong., 1st Sess. 1991) introduced by Representative Timothy Penny of Minnesota was dead on arrival.   Among other things, the Act would have required participation in presidential debates, which would have been organized by nonpartisan entities, to include candidates who had received primary federal matching funds and had qualified for the ballot in at least forty states.

117.    The supreme political significance of presidential elections justifies a unique

constitutional jurisprudence.

118.    The organization and conduct of presidential debates by Defendants, including rules

governing participation, are subject to the constraints of the First Amendment because of their

integral role in electing the President of the United States according to the rationale of *Terry*.

119.    The fifteen percent (15%) polling criterion for participation in presidential debates

constitutes an unreasonable burden on free speech or political association in violation of the First

Amendment.

120.    The fifteen percent (15%) threshold was selected by Defendants with the specific intent

of suppressing the viewpoints of third party or independent presidential candidates and to boost

the political speech of the two major party nominees.

121.    The fifteen percent (15%) threshold is superfluous to confining presidential debate

participants to a reasonable number consistent with the objective of an informed electorate. As

referenced above, a participation standard that required qualification on ballots in sufficient

states to win an electoral-college majority would both promote voter education and prevent an

unmanageable number of debaters.

122.     The fifteen percent (15%) threshold gives the two old, established parties a decided

advantage over the candidates of any third party or independent characteristically struggling for

existence, and thus place substantial burdens on the First Amendment right to associate.

123.    The First Amendment right to form a party for the advancement of political goals means

little if that party's presidential nominee can be arbitrarily excluded from presidential debates

and denied an equal opportunity to win votes.

124.    The right to vote for president is heavily burdened if that vote can be cast—as a practical matter-for only one of the two major party nominees who participated in presidential debates when other third party or independent candidates are clamoring for debate participation.

125.    There is no compelling interest in Defendants' fifteen percent (15%) polling criterion as a condition for participation in presidential debates.

126.    The criterion does not simply promote a "two-party system;" it favors two particular parties-the Republicans and the Democrats — and in effect tends to give them a complete monopoly on the White House.

127.    Competition in ideas and government policies should be the alpha and omega of the presidential electoral process and of First Amendment freedoms.

128.    To permit Defendants the power to confine presidential debates to the nominees of the two major parties would stifle the growth of new or fledgling parties or independent candidates who work to increase their strength year to year.

129.    To permit Defendants the power to confine presidential debates to the nominees of the two major parties is unreasonable in light of the purposes served by the debates.

130.    The fifteen percent (15%) polling criterion imposes a burden on voting and associational rights in violation of the First Amendment.

131.    As a direct and proximate cause of Defendants' violation of the First Amendment, Plaintiffs have been injured in their businesses and property, including lost campaign contributions, volunteers, media exposure, name recognition, philosophical or ideological branding, voter support, public credibility and valuable goodwill.

132.    As a direct and proximate cause of Defendants' violation of the First Amendment,

Plaintiffs have suffered actual damages in an amount to be determined at trial, including, inter

alia, loss of revenue, loss of profits, and increased costs.

## FOURTH CLAIM FOR RELIEF

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AND RELATIONS

133.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if they were fully

set forth herein.

134.    Defendants' anticompetitive, exclusionary conduct as described herein gives rise to

common law liability for intentional interference with prospective economic advantage and

prospective contractual or business relations.

135.    At all relevant times, Plaintiffs had legitimate expectations of economic relationships

with third parties, including presidential debate organizers and sponsors, contributors, and media

outlets.

136.    The prospective relationships would have provided economic and other benefits to

Plaintiffs but for Defendants' tortious and anticompetitive exclusionary conduct.

137.    At all relevant times, Defendants knew of Plaintiffs' prospective contractual and

economic relationships with third parties, as well as with the Commission but for the

exclusionary conduct and demands of the RNC, DNC, and the individual defendants.

138.    Defendants willfully engaged in unlawful, anticompetitive, and exclusionary acts and

practices with the intent to disrupt Plaintiffs' prospective contractual and economic relationships.

139.    The foregoing acts and practices, and the continuing course of the RNC's, DNC's, the Commission's and Fahrenkopf's anticompetitive and tortious conduct, deliberately and directly resulted in the interference with Plaintiff's prospective contractual and business relations.

140.    The foregoing acts and practices, and the continuing course of Defendants' anticompetitive and tortious conduct, directly and proximately caused Plaintiffs to suffer injury and damages to their business and property.

141.    Defendants RNC, DNC, the Commission, and Fahrenkopf committed these tortious acts with deliberate and actual malice, ill-will, and specific knowledge that their actions constituted an outrageous, willful and wanton disregard of Plaintiff's legal rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray that judgment be entered in their favor on all Counts, and that Plaintiffs be granted the following relief:

5.    Adjudge and declare that Defendants have engaged in unlawful restraints of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §15 (2012).

6.    Adjudge and declare that Defendants have engaged in continued monopolization, attempts to monopolize, and conspiracies to monopolize the presidential debates market, the presidential elections market, and the electoral politics market in the United States in violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §15 (2012).

7.  Award Plaintiffs treble the amount of damages each sustained as a result of the violations of the antitrust laws alleged herein during the past four years, pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15 (2012).

8.  Adjudge and declare that the fifteen percent (15%) polling criterion used by Defendants violates the First Amendment, award Plaintiffs damages directly and proximately caused by the violation, and enjoin enforcement of the criterion.

9.  Award Plaintiffs damages attributable to Defendants' tortious interference with Plaintiffs' prospective economic advantages and relations, including but not limited to, an award of punitive damages.

10. Equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26 (2012), including (a) an order compelling the dissolution of the Commission; and (b) an injunction against any further boycott or other agreement in restraint of trade between the RNC and the DNC or any of their candidates or their agents, or involving the Commission that would exclude from presidential debates candidates who have obtained sufficient state ballot access to win an electoral-college majority.

11. Award Plaintiffs their attorneys' fees, costs, and disbursements in this action, pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15 (2012).

12. Award Plaintiffs their prejudgment interest in this action, pursuant to Section 4 of the Clayton Act, 15 U.S.C. §15 (2012).

13. Grant Plaintiffs such other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of

all claims and issues so triable.

Dated this 29th day of September, 2015.

*s/ Bruce Fein*
Bruce Fein (D.C. Bar #446615)
W. Bruce DelValle* (FL Bar 779962)
FEIN & DELVALLE PLLC
300 New Jersey Avenue, N.W., Suite 900
Washington, D.C. 20001
Telephone: (202) 465-8727
Facsimile: (202) 347-0130
bruce@feinpoints.com
DelValle@feindelvalle.com

*Pro Hac Vice Motion to be Filed or Pending

# Exhibit "1"

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding constitutes an agreement between Obama for America and Romney for President (the "campaigns") regarding the rules that will govern debates in which the campaigns participate in 2012. This agreement shall be binding upon the campaigns.

1.      **Number, Dates, Time, Locations, Topics**

    (a)      Presidential Debates

| Date | Location |
|---|---|
| Wednesday, October 3 | University of Denver<br>Denver, CO |
| Tuesday, October 16 | Hofstra University<br>Hempstead, NY |
| Monday, October 22 | Lynn University<br>Boca Raton, FL |

    (b)      Vice Presidential Debate

| Date | Location |
|---|---|
| Thursday, October 11 | Centre College<br>Danville, KY |

    (c)      Each debate shall begin at 9 p.m. Eastern Daylight Time.

    (d)      The parties agree that they will not (1) issue any challenges for additional debates, (2) appear at any other debate or adversarial forums except as agreed to by the parties, or (3) accept any television or radio air time offers that involve a debate format or otherwise involve the simultaneous appearance of more than one candidate.

    (e)      The topic of the October 3 (First Presidential) debate shall be domestic policy. The topic of the October 22 (Third Presidential) debate shall be foreign policy. The October 11 (Vice Presidential) debate and the October 16 (Second Presidential) debate shall not be limited by topic

and shall include a balance of questions on topics including foreign policy and national security, on the one hand, and domestic and economic policy on the other.

## 2.      Sponsorship

The two campaigns will participate in four debates sponsored by the Commission on Presidential Debates (the "Commission"). The Campaigns agree that the Commission shall sponsor the debates, subject to its expression of a willingness to employ the provisions of this agreement in conducting these debates. In the event the Commission does not so agree, the two campaigns jointly reserve the right to determine whether an alternate sponsor is preferable. The parties agree that the Commission's Nonpartisan Candidate Selection Criteria for 2012 General Election Debate participation shall apply in determining the candidates to be invited to participate in these debates.

## 3.      Participants

If one or more candidates from campaigns other than the two (2) signatories are invited to participate pursuant to those Selection Criteria, those candidates shall be included in the debates, if those candidates accept the terms of this agreement. Any modifications to this agreement must be agreed upon by each of the signatories to this agreement as well as all other candidates selected to join the debate.

## 4.      Moderator

(a)      Each debate will have a single moderator;

(b)      The parties have accepted the Commission's recommendations of the below-listed moderators. The Commission shall provide each moderator with a copy of this agreement and shall use its best efforts to ensure that the moderators implement the terms of this agreement.

(i)      Jim Lehrer for the First Presidential debate, October 3, 2012 at the University of Denver.

(ii)      Candy Crowley for the Second Presidential debate, October 16, 2012 at

Exhibit "1"
Johnson v. Commission on Presidential Debates

Hofstra University.

(iii)      Bob Schieffer for the Third Presidential debate, October 22, 2012 at Lynn

University.

(iv)      Martha Raddatz for the Vice Presidential debate, October 11, 2012 at

Centre College.

5.      **Rules Applicable to All Debates**

The following rules shall apply to each of the four debates:

(a) Each debate shall last for ninety (90) minutes, with the time commencing from the start

of the moderator's opening to the conclusion of the moderator's closing.

(b) For each debate, there shall be no opening statements.  There shall be a 2 minute closing

statements in the First debate, a 90 second closing in the Vice President debate, and for the Third

Presidential debate, the campaigns will resolve the choice between a 90 second and a 2 minute

closing by coin toss.  There will be no closing statement in the Second Presidential Town Hall

debate. The order of these closing statements shall be determined by coin toss.

(c) No props, notes, charts, diagrams, or other writings or other tangible things may be

brought into the debate by any candidate, including portable electronic devices, and prior to the

beginning of the debate, the Commission will verify as appropriate that the candidates have

complied with this subsection.  No candidate may reference or cite any specific individual sitting in a

debate audience (other than family members) at any time during a debate.  If a candidate references

or cites any specific individual(s) in a debate audience, or if a candidate uses a prop, note, or other

writing or other tangible thing during a debate, the moderator must interrupt and explain that

reference or citation to the specific individual(s) or the use of the prop, note, or other writing or

thing violates the debate rules agreed to by that candidate.

Exhibit "1"
Johnson v. Commission on Presidential Debates

(d) Notwithstanding subparagraph 5(c), the candidates may take notes during the debate on the size, color, and type of blank paper each prefers and using the type of pen or pencil that each prefers. The staff of the candidate will place such paper, pens, and pencils on the podium, table, or other structure to be used by the candidate in that debate.

(e) The candidates may not ask each other direct questions during any of the four debates.

(f) The order of questioning shall be determined as follows: The Commission will conduct a coin toss at least seventy-two (72) hours before the First Presidential debate (October 3). At that time, the winner of the coin toss shall have the option of choosing, for the October 3 debate, whether to take the first or second question. At that time, the loser of the coin toss will have the choice of question order for the October 22 (Third Presidential) debate. For the October 16 (Second Presidential-Town Hall) debate, there shall be a separate coin toss, with the winner choosing whether to take the first or second question. The Commission shall set a time at least seventy-two (72) hours before the October 16 (Second Presidential-Town Hall) debate at which the candidates shall make their choices for that debate.

(g)    President Obama shall be addressed by the moderator as "Mr. President" or "President Obama".   Governor Romney shall be addressed by the moderator as "Governor" or "Governor Romney".

(h)    The candidates shall not address each other with proposed pledges.

(i)    In each debate, the moderator shall:

(i)    Open and close the debate and enforce all time limits. Where a candidate exceeds the permitted time for comment, the moderator shall interrupt and remind both the candidate and the audience of the expiration of the time limit and call upon such candidate to observe the strict time limits that have been agreed upon herein.

(ii)    Use his or her best efforts to ensure that the questions are reasonably well

balanced in all debates and within the designated subject matter areas of the October 3 (First Presidential) debate and October 22 (Third Presidential) debate in terms of addressing a wide range of issues of major public interest facing the United States and the world.

(iii)     Vary the topics on which he or she questions the candidates and ensure that the topics of the questions are fairly apportioned between the candidates, except that in the First Debate, the moderator shall apportion the questions within the broad topic areas announced by the Commission for that debate.

(iv)     Use best efforts to ensure that the two candidates speak for approximately equal amounts of time during the course of each debate and within each segment of each debate.

(v)     Use any reasonable method to ensure that the agreed-upon format is followed by the candidates and the audience.

(vi)     Alternate between the candidates the one responding first to questions.

(j)     At no debate shall the moderator ask the candidates for a "show of hands" or similar calls for response.

## 6.     Additional Rules Applicable to the October 3 and October 22 Debates

For the October 3 (First Presidential) debate, the candidates will appear at podiums. For the October 22 (Third Presidential) debate, the candidates shall be seated jointly at a table, in a style similar to previous presidential debates employing that format. The October 3 (First Presidential) debate and October 22 (Third Presidential) debate shall be governed by the rules set forth in section 5 and the following additional rules:

(a)     There shall be no audience participation in the October 3 (First Presidential) debate and October 22 (Third Presidential) debate.  Except as provided by the agreed upon rules of

the October 16 town hall debate, members of the debate audience will be instructed by the moderator before the debate goes on the air and by the moderator after the debate goes on the air not to applaud, speak, or otherwise participate in the debate by any means other than by silent observation, as further provided and enforced under section 9(a)(viii).  The moderator shall direct the first question to the candidate determined by the procedure set forth in subparagraph 5(f) of section 5.

(b)     The October 3 First Presidential debate and the October 22 Third Presidential debate shall be broken into six, 15-minute segments. Each segment will begin with the moderator introducing a topic and giving each candidate 2 minutes to comment on the topic. After these initial answers, the moderator will facilitate an open discussion of the topic for the remaining approximately 8 minutes and 45 seconds, ensuring that both candidates receive an equal amount of time to comment. The candidates will reverse the order of response to the next and subsequent questions.

(c)     At no time during the October 3 First Presidential debate shall either candidate move from his designated area behind his respective podium.  At no time during the October 22 Third Presidential debate shall either candidate move from his designated area seated behind the table.

7.     **Additional Rules Applicable to the October 16 Debate**

The October 16 (Second Presidential) debate will be conducted in an audience participation ("Town Hall") format. This debate shall be governed by the rules set forth in section 5 (as applicable), and the staging of the debate, including the audience size, will be determined by the Commissioner producer in consultation with, and subject in its details to, the agreement of both candidates, to achieve consistency with the traditional Town Hall format.   In addition, there shall be the following additional rules:

(a)      There shall be no audience participation in the October 16 (Second Presidential-Town Hall) debate other than as described below. Other than for an audience member asking a question as permitted by this section, at the start of the October 16 (Second Presidential-Town Hall) debate and in the event of and in each instance whereby an audience member(s) attempts to participate in the debate by any means thereafter, the moderator shall instruct the audience to refrain from any participation in the debate as described in section 9(a) (viii) below. The moderator shall facilitate audience members in asking questions to each of the candidates, beginning with the candidate determined by the procedure set forth in subparagraph 5(f). The answer segments will be structured as follows: A question is asked of Candidate A. That candidate will respond to the question for up to 2 minutes.  Candidate B will then have 2 minutes to respond.  Following those initial answers, the moderator will invite the candidates to respond to the previous answers, beginning with Candidate A, for a total of 2 minutes, ensuring that both candidates receive an equal amount of time to comment.  In managing the two-minute comment periods, the moderator will not rephrase the question or open a new topic. The candidates will reverse the order of responses to the next question.

(b)      After completion of the discussion of the first question, the moderator shall call upon another audience member to direct a question to the candidate who did not respond initially to the first question, and follow the procedure outlined in paragraph 7(a) above. Thereafter, the moderator shall follow the procedures in this paragraph by calling upon another audience member to ask a question of the first candidate and shall continue to alternate the candidate who first answers each successive question.

(c)      With respect to all questions:

(i)      The moderator shall select the questioners, but she may not "coach" the questioners.

(ii)     As set forth in section 7(e), questioners shall not be allowed to make

statements, speeches, or comments. They must ask their question as originally

submitted and selected by the moderator and make no other comments.

(iv)     The moderator will not ask follow-up questions or comment on either the

questions asked by the audience or the answers of the candidates during the debate

or otherwise intervene in the debate except to acknowledge the questioners from the

audience or enforce the time limits, and invite candidate comments during the 2

minute response period.

(v) The two campaigns shall agree upon a method for selection of the audience for

the town hall debate pursuant to subparagraph (f) below.

(d)     The audience members shall not ask follow-up questions or otherwise participate in

the extended discussion, and the audience member's microphone shall be turned off after he or she

completes asking the questions.

(e)     Prior to the start of the debate, audience members will be asked to submit their

questions in writing to the moderator. No third party, including the Commission and the campaigns,

shall be permitted to see the questions. The moderator shall approve all questions to be posed by the

audience members to the candidates. The moderator shall ensure that the audience members pose to

the candidates a balance of questions on foreign policy and national security, on the one hand, and

domestic and economic policy on the other.  The moderator will further review the questions and

eliminate any questions that the moderator deems inappropriate. At least seven (7) days before the

October 16 (Second Presidential-Town Hall) debate, the moderator shall develop, and describe to

the campaigns, a method for selecting questions at random while assuring that questions are

reasonably well balanced in terms of addressing a wide range of issues of major public interest facing

the United States and the world. Each question selected will be asked by the audience member

submitting that question. If any audience member poses a question or makes a statement that is in any material way different than the question that the audience member earlier submitted to the moderator for review, the moderator will cut-off the questioner and advise the audience that such non-reviewed questions are not permitted. Moreover, the Commission shall take appropriate steps to cut-off the microphone of any such audience member who attempts to pose any question or statement different than that previously posed to the moderator for review. The moderator will inform the audience of this provision prior to the start of the debate.

(f)     Subject to the consultation and agreement procedure affecting staging, as described in this section, the debate will take place before a live participating audience of persons who shall be seated and who describe themselves as likely voters. These participants will be selected by the Gallup Organization ("Gallup"), using a methodology approved in writing by the campaigns. Gallup shall have responsibility for selecting the nationally demographically representative group of voters. At least fourteen (14) days prior to October 16 (Second Presidential-Town Hall) debate, Gallup shall provide a comprehensive briefing on the selection methodology to the campaigns, and both campaigns shall approve the methodology. Either campaign may raise objections on the methodology to Gallup and to the Commission within twenty-four (24) hours of the briefing, and Gallup shall revise the methodology accordingly.

(g)     Participants selected shall not be contacted directly or indirectly by the campaigns before the debate. The Commission shall not contact the participants before the debate other than for logistical purposes.

8.     **Additional Rules Applicable to October 11 (Vice Presidential) Debate**

For the debate between the two candidates for Vice-President, the candidates will be seated at a table following the same basic rules and staging provisions (except as otherwise noted here) for the October 22 (Third Presidential) debate. There shall be no audience participation of any kind.

Exhibit "1"
Johnson v. Commission on Presidential Debates

The stage position for each candidate shall be determined by a flip of the coin, witnessed by the campaigns' representatives, no less than 72 hours before the start of the debate.

(a)     The moderator shall ask questions of each candidate in alternating order with the recipient of the first question determined by a flip of the coin, witnessed by the campaigns' representatives, no less than 72 hours before the start of the debate. When asked a question, the first candidate will have two minutes in which to respond, the second candidate will have two minutes to comment on the response, and then the moderator will lead a 4 minute 15 second minute discussion with the time to be evenly divided between the candidates.

(b)     There will be no opening statements. Each candidate shall have two minutes in which to make a closing statement with the order of those statements determined by a flip of the coin, witnessed by the campaigns' representatives, no less than 72 hours before the start of the debate. The moderator shall take steps to ensure that each candidate has the full two minutes provided in this paragraph, and the Commission shall take steps to ensure that the closing statements are included in the nationwide broadcast, notwithstanding any other provision in this agreement.

(c)     If there are any discrepancies between this paragraph and any other provision of this agreement, the provisions of this paragraph shall govern. Any issues not anticipated by this paragraph or the agreement shall be resolved at the debate site by the campaigns' representatives and, failing a resolution, by a coin flip.

(d) Each campaign will advise the moderator of the choice of address that it would prefer.

9.     **Staging**

(a)     The following rules apply to each of the four debates:

(i)     All staging arrangements for the debates not specifically addressed in this agreement shall be jointly addressed and agreed to by representatives of the two

Exhibit "1"
Johnson v. Commission on Presidential Debates

campaigns. In this regard, the Commission staff -- including the broadcast producer -- shall meet at least once daily and simultaneously with a representative of each campaign, and the Commission shall provide reasonable daily access to the stage and debate site, on an equal basis but not simultaneously, for each campaign.

(ii)      The Commission will conduct a coin toss at least seventy-two hours before the October 3 (First Presidential) debate. At that time, the winner of the coin toss shall have the option of choosing stage position for the October 3 debate; the loser of the coin toss will have first-choice of stage position for the October 22 (Third Presidential) debate. The loser of the coin toss or his representative shall communicate his stage position choice by email to the Commission and to the other campaign at least seventy-two (72) hours before the October 22 (Third Presidential) debate. The stage position for the October 16 (Second Presidential-Town Hall) debate will be determined by a coin toss to take place at least seventy-two (72) hours before the debate. The stage position for the October 11 (Vice Presidential) debate will be determined by a separate coin toss to take place at least seventy-two (72) hours before that debate.

(iii)     For the October 3 (First Presidential) debate, October 11 (Vice Presidential), October 16 (Second Presidential-Town Hall) debate, and October 22 (Third Presidential) debate, the candidates shall enter the stage simultaneously, from opposite ends of the stage, upon a verbal cue by the moderator after the program goes on the air, proceed to center stage, shake hands, and proceed directly to their positions.

(iv)     Except as provided in subparagraph (d) (viii) of this paragraph 9, TV cameras will be locked into place during all debates. They may, however, tilt or rotate as

needed to frame the candidate or moderator.

(v)     Except as provided in subparagraph 9(d) (viii), TV coverage during the
question and answer period shall be limited to shots of the candidates or moderator,
and in no case shall any television shots be taken of any member of the audience
(including candidates' family members) from the time the first question is asked until
the conclusion of the closing statements, if any. When a candidate is speaking, either
in answering a question or making his closing statement, TV coverage will be limited
to the best of the Commission's ability to the candidate speaking. To the best of the
Commission's abilities, there will be no TV cut-aways to any candidate who is not
responding to a question while another candidate is answering a question or to a
candidate who is not giving a closing statement while another candidate is doing so.

(vi)    The camera located at the rear of the stage shall he used only to take shots of
the moderator and will not show the notes taken by the candidates.

(vii)   For each debate, each candidate shall have camera-mounted, timing lights
corresponding to the timing system described in section 9(b) (vi) below positioned in
his or her line of sight. The candidates will, have a countdown clock for all the 2-
minute responses and any closing statements.

(viii)  All members of the debate audience will be instructed by the moderator
before the debate goes on the air and by the moderator after the debate goes on the
air not to applaud, speak, or otherwise participate in the debate by any means other
than by silent observation, except as provided by the agreed upon rules of the
October 16 town hall debate. The moderator shall also state that, should an audience
member fail to comply with this requirement, he or she will be subject to removal
from the audience and from the facility.  In the event of and in each instance

Exhibit "1"
Johnson v. Commission on Presidential Debates

whereby an audience member(s) violates this requirement, the moderator shall restate the instruction for the entire audience and shall also use his or her best efforts to enforce this provision, as appropriate, against the specific audience members failing to comply with the instructions pursuant to this subparagraph.

(ix)     The Commission shall use best efforts to maintain an appropriate temperature as agreed to by the campaigns.

(x)     Each candidate shall be permitted to have a complete, private production and technical briefing and walk-through ("Briefing") at the location of the debate on the day of the debate. The order of the Briefing shall be determined by agreement or, failing candidate agreement, a coin flip. Each candidate will have a maximum of one (1) hour for this Briefing. Production lock-down will not occur for any candidate unless that candidate has had his or her Briefing. There will be no filming, taping, photography, or recording of any kind (except by that candidate's personal photographer) allowed during the candidates' Briefing. No media, other than as stated herein, will be allowed into the auditorium where the debate will take place during a candidate's Briefing. All persons, including but not limited to the media, other candidates and their representatives, and the employees or agents of the Commission, other than those necessary to conduct the Briefing, shall vacate the debate site while a candidate has his or her Briefing. The Commission will provide to each candidate's representatives a written statement and plan which describes the measures to be taken by the Commission to ensure the complete privacy of all briefings.

(xi)     The color and style of the backdrop will be recommended by the Commission and agreed to by representatives of the campaigns. The Commission

Exhibit "1"
Johnson v. Commission on Presidential Debates

shall make its recommendation known to the campaigns at least seventy-two (72) hours before each debate. The backdrops behind each candidate shall be identical.

(xii)    The set will be completed and lit no later than 3 p.m. at the debate site on the day before the debate will occur.

(xiii)    Each candidate may use his or her own makeup person, and adequate facilities shall be provided by the Commission at the debate site for makeup.

(xiv)    In addition to Secret Service personnel and other provision for official support as required by law and standard protocols for the President, each candidate will be permitted to have one (2) pre-designated staff member in the wings or in the immediate backstage area during the debate at a location to be mutually agreed upon by representatives of the campaigns at each site. All other staff must vacate the wings or immediate backstage areas no later than five (5) minutes before the debate commences. A PL phone line will be provided between each candidate's staff work area and the broadcast producer.

(xv)    Each candidate shall be allowed to have one (1) professional still photographer present on the stage before the debate begins and in the wings during the debate as desired and on the stage immediately upon the conclusion of the debate. No photos shall be taken from the wings by these photographers during the debate. Photos taken by these photographers may be distributed to the press as determined by each candidate. In addition, the press pool accompanying each candidate shall be included in a pool to be formed by the Commission for pre- and post-debate photography from the buffer zone.

(b)    In addition to the rules in subparagraph (a), the following rules apply to the October 3  (First Presidential) debate:

14

(i)     The Commission shall construct the podiums and each shall be identical to view from the audience side. The podiums shall measure fifty (50) inches from the stage floor to the outside top of the podium facing the audience and shall measure forty-eight (48) inches from the stage floor to the top of the inside podium writing surface facing the respective candidates, and, otherwise shall be constructed in the style and specifications recommended by the Commission, shown in Attachment A, and approved by the campaigns. There shall be no writings or markings of any kind on the fronts of the podiums. No candidate shall be permitted to use risers or any other device to create an impression of elevated height and no candidate shall be permitted to use chairs, stools, or other seating devices during the debate.

(ii)    Each podium shall have installed a fixed hardwired microphone, and an identical microphone to he used as backup per industry standards, and approved by the campaigns.

(iii)   The podiums will be equally canted toward the center of the stage at a degree to be determined by the Commission's producer and approved by the campaigns. The podiums shall be 10' apart; such distance shall be measured from the left-right center of a podium to the left-right center of the other podium.

(iv)    The moderator will be seated at a table so as to be positioned in front, between, and equidistant from the candidates, and between the cameras to which the candidates direct their answers.

(v)     At least ten days before each debate, the Commission shall submit for joint approval of the campaigns a diagram for camera placement, set design, and room configuration to include the audience seating breakdown.

(vi)    Time cues in the form of colored lights will be given to the candidates and

the moderator when there are thirty (30) seconds remaining, fifteen (15) seconds remaining, and five (5) seconds remaining, respectively for the two (2) minute and other timed answers.  Pursuant to Section 5(j) (i), the moderators shall enforce the strict time limits described in this agreement.  Each candidate will have a countdown clock which will show the seconds left in any two minute answer or closing statement.

(c)    In addition to the rules in subparagraph (a), the following rules apply to the October 16 (Second Presidential-Town Hall) debate:

(i)The candidates shall be seated on director chairs (with backs) before the audience, which shall be seated in approximately a horseshoe arrangement as symmetrically as possible around the candidates. Consistent with the terms of Section 7, the precise staging arrangements will be determined by the Commission's producer subject to the approval of representatives of both campaigns.

(ii)    The chairs shall be identical and have backs and a footrest and shall be approved by the candidates' representatives.

(iii)    Each candidate shall have a place to put a glass of water and paper and pens or pencils for taking notes (in accordance with section (d)) of sufficient height to allow note taking while sitting on the chair, and which shall be designed by the Commission, subject to the approval of representatives of both campaigns.

(iv)    Each candidate may move about in a pre-designated area, as proposed by the Commission and approved by each campaign, and may not leave that area while the debate is underway. The pre-designated areas of the candidates may not overlap.

(v)    Each candidate shall use a wireless hand held microphone (with appropriate back-up) to allow him to move about and to face different directions while responding to

Exhibit "1"
Johnson v. Commission on Presidential Debates

questions from the audience.

(vi)     At least ten days before each debate, the Commission shall submit for approval by the campaigns a diagram for camera placement, set design, and room configuration to include the audience seating breakdown.

(vii)    At least seven (7) days before the October 16 (Second Presidential-Town Hall) debate, the Commission shall recommend a system of time cues subject to approval by both campaigns and consistent with the cues described in section 9(b)(vi).

(viii)   Notwithstanding sections 9 (a)(iv) and (v), a roving camera may be used for shots of an audience member only during the time that the audience member is asking a question.

(ix)     Prior to the start of the debate, neither the moderator nor any other person shall engage in a "warm up" session with the audience by engaging in a question or answer session or by delivering preliminary remarks.  The moderator shall inform the audience of the rules of the debate, including the instruction that any audience member chosen to ask a question must ask the question he or she submitted, as described in Sections 7 (a) and (e).

(d)      In addition to the rules in subparagraph (a), the following rules apply to the October 11 (Vice-Presidential) debate and the October 22 (Third Presidential) debate:

    (i)      The candidates shall be seated at a table similar to the design used in prior Presidential and Vice Presidential debates with the moderator facing the candidates with his back to the audience and the candidates appearing on either side of the moderator.  The precise design of the table and staging arrangements will be determined by the Commission subject to the approval of representatives of both campaigns.  The Commission will submit a design for the table to the campaigns as soon as practicable but in no event later than 10 days before the Vice Presidential debate.  The same table and design will be used for the October 22 Third

Presidential Debate.

(ii)     The chairs shall be swivel chairs that can be locked in place, shall be identical and shall be approved by the candidates' representatives.

(iii)     Each candidate shall have a place to put a glass of water and paper and pens or pencils for taking notes (in accordance with section (d)).

(iv)     Each candidate and the moderator shall have a wireless lapel microphone, and an identical microphone to be used as a backup.

(v)     At least ten days before both debates, the Commission shall submit for approval by the campaigns a diagram for camera placement, set design, and room configuration to include the audience seating breakdown.

(vi)     At least seven (7) days before the October 11 (Vice Presidential debate) and the October 22 (Third Presidential) debate, the Commission shall recommend a system of time cues subject to approval by both campaigns and consistent with the cues described in section 9(b)(vi).

(vii)     The candidates shall remain seated throughout these two debates.

**10.     Ticket Distribution and Seating Arrangements**

(a)     The Commission shall be responsible for printing and ensuring security of all tickets to all debates. Each campaign shall be entitled to receive directly from the Commission one-third of the available tickets (excluding those allocated to the participating audience in the October 16 debate), with the remaining one-third going to the Commission.

(b)     In the October 16 Town Hall debate, the participating audience shall be separated from any nonparticipating audience, and steps shall be taken to ensure that the participating audience is admitted to the debate site without contact with the campaigns, the media, or the nonparticipating audience.

Exhibit "1"
Johnson v. Commission on Presidential Debates

(c)     The Commission shall allocate tickets to the campaigns in such a manner as to ensure that supporters of each candidate do not sit in a block and are interspersed with supporters for the other candidate and interspersed with tickets distributed by the Commission. For the October 3 (First Presidential) debate, October 11 (Vice Presidential) debate, and October 22 (Third Presidential) debate, the family members of each candidate shall be seated in the front row, diagonally across from the candidate directly in his line of sight while seated or standing at the podium. For the October 16 (Second Presidential) debate, the family members of each candidate shall be seated as mutually agreed by representatives of the campaigns.

(d)     Any media seated in the auditorium shall be accommodated only in the last two (2) rows of the auditorium farthest from the stage. Two (2) still photo stands may be positioned near either side of the television camera stands located in the audience.  (A media center with all necessary feeds will be otherwise available.)

(e)     Tickets will be delivered by the Commission to each candidate's designated representative by 12:00 noon on the day preceding each debate. The Commission will invite from its allotment (two (2) tickets each) an agreed upon list of officeholders such as the U.S. Senate and House Majority and Minority Leaders, the Governor and Lieutenant Governor of the State holding the debate and in the case of the October 16 (Second Presidential debate) that metropolitan area, an appropriate list of other public officials and the President of the University sponsoring the debate. The Commission shall not favor one candidate over the other in the distribution of its allotment of tickets.

11.     **Dressing Rooms/Holding Rooms**

(a)     Each candidate shall have a dressing room available of adequate size so as to provide private seclusion for that candidate and adequate space for the staff the candidate desires to have in

this area. The two (2) dressing rooms shall be comparable in size and in quality and in proximity and access to the debate stage.

(b)      An equal number of other backstage rooms will be available for other staff members of each candidate. Any rooms located next to the media center shall be located so that each campaign has equal proximity and ease of access to the media center. Each candidate's rooms shall be reasonably segregated from those designated for the other candidate. If sufficient space to accommodate the above needs is not available at a particular debate facility, the Commission shall provide trailers or alternative space mutually agreeable to the candidates' representatives at the Commission's expense. Space that is comparable in terms of size, location, and quality shall be provided to the two campaigns. These rooms shall be made available at least seventy-two (72) hours in advance of the beginning of each debate.

(c)      The number of individuals allowed in these rooms or trailers shall be determined solely by each candidate in conjunction with the Secret Service. .

(d)      The Commission shall insure that each campaign is provided with a television feeds that are on-air (as opposed to only the in-house feed from the production truck).  The campaigns agree that these televisions and hook-ups are to be provided at their own expense.

12.    **Media**

(a)      Each candidate will receive not fewer than eighty (80) press passes for the Media Center during the debate and more if mutually agreed upon by the campaigns.

(b)      The Commission will be responsible for all media credentialing.

13.    **Survey Research**

The sponsor of the debates agrees that it shall not, prior to two days after the Presidential Inauguration of 2013, release publicly or to the media or otherwise make publicly available any survey research (including polls or focus group results or data) concerning the performance of the

candidates in the debate or the preferences of the individuals surveyed for either candidate.

14.    **Complete Agreement**

This memorandum of understanding constitutes the entire agreement between the parties

concerning the debates in which the campaigns will participate in 2012.

15.    **Amendments**

(d)    This Agreement will not be changed or amended except as agreed and confirmed in

writing by those persons who signed this Agreement their designees.

16.    **Ratification and Acknowledgement**

Agreed and Accepted:

By:      _____

Printed Name:     Robert Bauer

Title:      General Counsel, Obama for America

Executed on October _____ 3 _____, 2012


Agreed and Accepted:

By:      _____

Printed Name:     Ben Ginsberg

Title:      General Counsel, Romney for President

Executed on October _____, 2012

Exhibit "1"
Johnson v. Commission on Presidential Debates