## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Gary E. Johnson; Gary Johnson 2012, Inc.; Libertarian National Committee; James P. Gray; Green Party of the United States; Jill Stein; Jill Stein for President; and Cheri Honkala, <br><br> Plaintiffs, <br><br> v. <br><br> Commission on Presidential Debates; Republican National Committee; Democratic National Committee; Frank J. Fahrenkopf, Jr.; Michael D. McCurry; Barack Obama; and Willard Mitt Romney, <br><br> Defendants. | Case No. 1:15-CV-01580-RMC |

## DEFENDANTS DEMOCRATIC NATIONAL COMMITTEE'S AND BARACK OBAMA'S REPLY IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     ARGUMENT .................................................................................................... 1

    A.      Plaintiffs Lack Article III Standing.......................................................... 1

    B.      The Sherman Act Does Not Apply to Political Activity........................................ 7

    C.      Plaintiffs Lack Antitrust Standing. .................................................... 10

        1.      Plaintiffs' alleged injuries, if any, result from competition-enhancing conduct. ............................................................... 10

        2.      There is no causal connection between Defendants' acts and Plaintiffs' alleged injuries. ..................................................... 11

        3.      Plaintiffs' alleged damages are too speculative. ..................................... 13

    D.      Plaintiffs Fail to State Antitrust Claims. ............................................. 14

        1.      Plaintiffs' Section 1 and Section 2 claims fail for lack of a cognizable antitrust market. .............................................. 14

        2.      Plaintiffs' Section 1 and Section 2 conspiracy-based claims fail for lack of a plausible conspiracy. ....................................... 16

        3.      The CPD's Debates are Not Essential Facilities. .................................... 19

            a.      Defendants do not control an essential facility. .......................... 19

            b.      Plaintiffs can practically or reasonably duplicate the presidential debates. ............................................... 21

            c.      Plaintiffs have access to the presidential debates on reasonable terms. ................................................ 22

            d.      Including Plaintiffs in presidential debates was not feasible. ...... 22

    E.      Plaintiffs Fail to State a Claim Under the First Amendment. .............................. 24

    F.      Plaintiffs Fail to State a Claim Under D.C. Tort Law. ....................................... 25

III.    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) ...................................................................................7

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988)...................................................................................................9

*Apex Hosiery Co. v. Leader,*
    310 U.S. 469 (1940)...................................................................................................7

*Arjay Assocs. v. Bush,*
    891 F.2d 894 (Fed. Cir. 1989)...................................................................................1

*\*Arkansas Educational Television Commission v. Forbes,*
    523 U.S. 666 (1998)......................................................................................... passim

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985).................................................................................................19

*Associated Press v. United States,*
    326 U.S. 1 (1945)............................................................................................ passim

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990).................................................................................................11

*\*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................17, 18, 23, 24

*Bigelow v. RKO Radio Pictures, Inc.,*
    327 U.S. 251 (1946).................................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).................................................................................................10

*Buchanan v. FEC,*
    112 F. Supp. 2d 58 (D.D.C. 2000) ...............................................................6, 18, 22

*Buckley v. Valeo,*
    424 U.S. 1 (1976).....................................................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page**

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
  148 F.3d 1080 (D.C. Cir. 1998) ...................................................................19

*Chandler v. Georgia Pub. Telecomm's Comm'n,*
  917 F.2d 486 (11th Cir. 1990) ....................................................................23

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) .....................................................................................1

*City of Anaheim v. S. Cal. Edison Co.,*
  955 F.2d 1373 (9th Cir. 1992) ....................................................................23

*Columbia Broadcasting System, Inc. v. Democratic National Committee,*
  412 U.S. 94 (1973) ...................................................................................2, 24

*Common Cause v. Dep't of Energy,*
  702 F.2d 245 (D.C. Cir. 1983) ...................................................................14

*Concord Assocs., L.P. v. Entm't Properties Trust,*
  --- F.3d ---, 2016 WL 1075947 (2d Cir. Mar. 18, 2016).......................15, 16

*Council for Emp't & Econ. Energy Use v. WHDH Corp.,*
  580 F.2d 9 (1st Cir. 1978)...........................................................................8

*\*Covad Commc'ns Co. v. Bell Atl. Corp.,*
  398 F.3d 666 (D.C. Cir. 2005) ...................................................................10

*Covad Comms. Co. v. Bell Atl. Corp.,*
  201 F. Supp. 2d 123 (D.D.C. 2002), *rev'd in part on other grounds*, 398 F.3d
  666 (D.C. Cir. 2005) ..............................................................................19, 23

*Cyber Promotions, Inc., v. Am. Online, Inc.,*
  948 F. Supp. 456 (E.D. Pa. 1996) ..............................................................22

*DeBauche v. Trani,*
  191 F.3d 499 (4th Cir. 1999) ......................................................................24

*Dial A Car, Inc. v. Transp., Inc.,*
  82 F.3d 484 (D.C. Cir. 1996).......................................................................16

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
  365 U.S. 127 (1961)...................................................................................8, 9

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Eastern States Retail Lumber Dealers' Ass'n v. United States*,
    234 U.S. 600 (1914) ..................................................................................................3

*Federal Trade Commission v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) ...........................................................................................15, 16

*Fulani v. Brady*,
    729 F. Supp. 158 (D.D.C. 1990) ...........................................................................23

*Fulani v. Brady*,
    935 F.2d 1324 (D.C. Cir. 1991) ............................................................................23

*Gottlieb v. FEC*,
    143 F.3d 618 (1998) .................................................................................................6

*Harris v. CitiMortgage, Inc.*,
    878 F. Supp. 2d 154 (D.D.C. 2012) .......................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) .................................................................17

*\*Johnson v. FCC*,
    829 F.2d (D.C. Cir. 1987) ..........................................................................1, 2, 7, 21

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...............................................................................17

*Kennedy for President Committee v. FCC*,
    636 F.2d 417 (D.C. Cir. 1980) .................................................................................2

*Klein v. Am. Land Title Ass'n*,
    926 F. Supp. 2d 193 (D.D.C. 2013), *aff'd*, 560 F. App'x 1 (D.C. Cir. 2014) ..........10

*Kroger Co. v. Sanofi-Aventis*,
    701 F. Supp. 2d 938 (S.D. Ohio 2010) ..................................................................14

*LaBotz v. FEC*,
    889 F. Supp. 2d 51 (D.D.C. 2012) .........................................................................22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................1

## TABLE OF AUTHORITIES
(continued)

**Page**

*Marjorie Webster Jr. Coll. Inc. v. Middle State Ass'n of Colleges & Secondary
Schs., Inc.*,
432 F.2d 650 (D.C. Cir. 1970) ..............................................................................7

*Marsh v. State of Alabama*,
326 U.S. 501 (1946).............................................................................................24

*\*Meijer, Inc. v. Barr Pharms., Inc.*,
572 F. Supp. 2d 38 (D.D.C. 2008) ......................................................................15

*\*Miami Herald Pub'g Co. v. Tornillo*,
418 U.S. 241 (1974).........................................................................................4, 5

*\*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984).............................................................................................17

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)...............................................................................................16

*Natural Law Party of the United States of America*,
111 F. Supp. 2d 33 (D.D.C. 2000) ........................................................................6

*Oberwetter v. Hilliard*,
680 F. Supp. 2d 152 (D.D.C. 2010) ......................................................................4

*\*Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,
475 U.S. 1 (1986)......................................................................................4, 5, 24

*Perot v. FEC*,
97 F.3d 553 (D.C. Cir. 1996) ...............................................................................7

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)................................................................................................4

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006).............................................................................................4, 5

*\*S. Pac. Commc'ns Co. v. AT&T Co.*,
556 F. Supp. 825 (D.D.C. 1982) .........................................................................13

*S. Pac. Commc'ns Co. v. AT&T Co.*,
740 F.2d 980 (D.C. Cir. 1984) ......................................................................15, 22

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Sargeant v. Dixon,*
    130 F.3d 1067 (D.C. Cir. 1997) ............................................................... 1

*\*Sheppard v. Lee,*
    929 F.2d 496 (9th Cir. 1991) ............................................................... 8, 9

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.,*
    33 F. Supp. 3d 14 (D.D.C. 2014) .......................................................... 18

*SolidFX, LLC v. Jeppesen Sanderson, Inc.,*
    935 F. Supp. 2d 1069 (D. Colo. 2013) .................................................. 21

*Terry v. Adams,*
    345 U.S. 461 (1953) ............................................................................. 25

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ................................................................................. 15

*\*U.S. Telecom Ass'n v. F.C.C.,*
    290 F.3d 415 (D.C. Cir. 2002) ......................................................... 20, 21

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956) ............................................................................. 16

*\*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) ................................................................ 9, 19, 22, 23

## Constitutional Provisions

U.S. Const. art. II, § 1 ................................................................................ 22

*U.S. Const. amend. I ........................................................................... passim

## Rules

Fed. R. Civ. P. 12(d) ........................................................................... 12, 24

## Statutes

15 U.S.C. § 1 ...................................................................................... passim

15 U.S.C. § 2 ...................................................................................... passim

## TABLE OF AUTHORITIES
(continued)

Page

OTHER AUTHORITIES

*Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
   Their Application* (4th ed. 2013)..............................................................9, 10, 15, 21

*Phillip Areeda, *Essential Facilities: An Epithet In Need of Limiting Principles*,
   58 Antitrust L.J. 841, 852 (19890)..........................................................................19

## I.     INTRODUCTION

Having failed to convince voters to support their candidacies and platforms, Plaintiffs now ask this Court to interfere in the political process. Plaintiffs claim that they have a legally enforceable right to participate in the "Super Bowl of politics"—the CPD-sponsored presidential debates—without having to meet the same criteria as every other candidate. But like playing in the real Super Bowl, which is limited to those NFL teams that win their conference, participation in the debates is not guaranteed to everyone. Plaintiffs' claims are meritless and foreclosed by decades of precedent, none of which is overturned by *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). As a threshold matter, because Plaintiffs have no legally cognizable right to participate in the debates, Plaintiffs lack Article III standing to pursue this litigation any further. But even if they had standing, Plaintiffs' Sherman Act claims would necessarily fail because the Act applies only to commerce and trade, not to the political activity at issue. Plaintiffs also lack antitrust standing, and though their response alleges facts far outside their Complaint, they still fail to state claims under the Sherman Act, the First Amendment or D.C. tort law.

## II.     ARGUMENT

### A.     Plaintiffs Lack Article III Standing.

Not all claimed injuries unlock the federal courthouse doors and Plaintiffs have failed to meet the constitutional requirement that they allege "invasion of a *legally protected* interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (emphasis added). *See also Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997) (no standing where injuries asserted "are not legally cognizable within the framework of Article III"); *Arjay Assocs. v. Bush*, 891 F.2d 894, 898 (Fed. Cir. 1989) (no standing where economic injury asserted was "to a nonexistent right to continued importation of a Congressionally excluded product" thus plaintiffs "have . . . no right capable of judicial enforcement and . . . suffered no injury capable of judicial redress").

Although courts sometimes have difficulty determining whether a particular injury is legally cognizable, the answer in this case is easy, because in *Johnson v. FCC*, 829 F.2d, 157, 162 (D.C. Cir. 1987), the D.C. Circuit found that "the specific right to appear on a specific

[presidential debate] program—a program not organized by the broadcasters, but by a third party," is not "legally cognizable." *Id.*

None of Plaintiffs' attempts to distinguish *Johnson* survive scrutiny. Plaintiffs' argument that *Johnson* only applies in cases "involving the broadcast media," Pls.' Consol. Oppos. To Defs.' Mots. To Dismiss Compl. ("Resp.") 53-54 (ECF No. 45), is particularly unsupportable. First, although Plaintiffs have not named the networks that will broadcast the debates as defendants, their allegations underscore that it is the fact of broadcasting that—according to Plaintiffs—makes participation valuable and their claims here actionable. *See, e.g.*, Compl. ¶ 3 (ECF No. 1) (alleging "[CPD] debates are broadcast nationally on television and radio by major broadcasters, command huge audiences, and constitute a cognizable 'presidential debates market' under federal antitrust laws"). *See also id.* ¶¶ 7, 24, 45, 63.

Plaintiffs' attempts to distinguish *Johnson* are also inconsistent with the opinion itself, in which the D.C. Circuit expressly found "no basis upon which to distinguish" the case before it from either *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 112-13 (1973), which held, even in light of the "fairness doctrine" then-applicable to broadcast licensees, "no private individual or group has a right to command the use of broadcast facilities," or *Kennedy for President Committee v. FCC*, 636 F.2d 417 (D.C. Cir. 1980), which held a candidate has no right of access to broadcast television to respond to an incumbent rival's press conference addressing the petitioner's candidacy. If anything, the court opined:

> [P]etitioners present a far weaker constitutional thesis than the ones those cases rejected. *They seek, not general access, as in the former, nor an opportunity to respond to a particular broadcast, as in the latter, but rather the specific right to appear on a specific program—a program not organized by the broadcasters, but by a third party.* Thus, viewed in light of the First Amendment balance struck in the statutory scheme, as delineated in the governing caselaw, petitioners have stated no legally cognizable claim to participate in the broadcast debates.

*Johnson*. 829 F.2d at 162 (emphasis added). The same holds true here. There is no logical support for the outcome that Plaintiffs urge: that a candidate has no legally cognizable claim to

participate in a debate when the candidate names as a defendant a broadcast media entity, but, somehow, when the same candidate seeks the same relief by suing only the third party sponsor and the political parties that have participated in the debates, a cognizable claim materializes.

Plaintiffs' response also illustrates precisely why they cannot meet Article III's "redressability" requirement. Plaintiffs concede (as they must) that President Obama "would have enjoyed First Amendment protection for a . . . strategy that ignored debates or appearances with any other candidate," Pls.' Resp. at 31, yet argue that such protection does not extend to a candidate's same strategic decision (as in the 2012 Memorandum of Understanding ("MOU") attached to Plaintiffs' Complaint). Nothing that Plaintiffs cite supports their position.

The opinion in *Associated Press v. United States*, 326 U.S. 1, 7 (1945), stands only for the unremarkable conclusion that the First Amendment does not insulate newspaper publishers "engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything else people need or want" from prosecution for "business practices made unlawful by the Sherman Act." It does not hold that federal courts may compel politicians to speak, or issue judgments penalizing their exercise of their right not to, in purported service of federal antitrust laws. And *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914), does not reference the First Amendment at all.

Plaintiffs' assertion that "the First Amendment is not offended by a government requirement that private parties . . . open up forums available to the public," Pls.' Resp. at 32, is similarly irrelevant to this case (or any other case about access to candidate debates), given the Supreme Court's holding in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998), that candidate debates do *not* qualify as "public forums." This is true even when the sponsor of the debate is a state-owned entity, and thus, unlike Defendants, a "state actor." *See id*. at 671. In so finding, the Court first noted that "[a]lthough public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine," but decided that televised debates occupy a special space, in large part because of their "particular importance" in the electoral process. *Id*. at 675-76. Yet, even this did not persuade the Court that a candidate had a

right of access to participate in the debates. Instead, the Court found that televised debates constituted, at most, "nonpublic forum[s]" from which debate sponsors may exclude candidates pursuant to reasonable, viewpoint-neutral criteria. *Id*. at 676.[1]

In *Forbes*, the Court also rejected another argument that Plaintiffs make—that the impact that a court order requiring debates to be opened to candidates who objectively lack substantial public support could have on the future of debates is speculative and "of no legal moment." Pls.' Resp. at 41. To the contrary, the Court found such concerns highly relevant, noting that, "[a]s a direct result of the Court of Appeals' decision in this case," a debate was canceled. *Forbes*, 523 U.S. at 681. This is consistent with Plaintiffs' Complaint, which acknowledges that, after the first televised presidential debates in 1960, no debates were held for several election cycles, because one or both of the major party candidates declined to participate. Compl. ¶ 51. It is well settled that, "[a] First Amendment jurisprudence yielding these results does not promote speech but represses it." *Forbes*, 523 U.S. at 681-82.[2]

Plaintiffs' response further illustrates precisely why their claims threaten Defendants' associational and speech rights. Indeed, the very case that Plaintiffs argue "disposes of Defendants' arguments" actually supports *Defendants*' position. In *Rumsfeld v. Forum for Academic and Institutional Rights*, the Court explained the critical differences between cases in

---

[1] *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980), cited by Plaintiffs, is inapposite. There, the Court found that, because the California Constitution expressly permitted "individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public is invited," it did not offend the First Amendment to require a private mall to allow "high school students who sought to solicit support for their opposition to a United Nations resolution" to "set up a card table in a corner of [the mall's] central courtyard" from which they "distributed pamphlets and asked passersby to sign petitions." *Id*. at 76. Not only is there no constitutional right of access to candidate debates, what Plaintiffs seek here is not remotely analogous to sitting at a table in a discrete section of a mall open to the public; they demand a court order conferring the right to stand on a stage with only a few other presidential candidates and engage them in a nationally-broadcast televised debate. The relevant line of cases is not the public forum jurisprudence to which *PruneYard* belongs, but the compelled speech cases, in which the Court has found that the First Amendment is violated because "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 48 (2006) (referencing *Miami Herald Pub'g Co. v. Tornillo*, 418 U.S. 241 (1974), and *Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986)), discussed further, *infra*.

[2] Plaintiffs incorrectly imply that, because *Forbes* went to a jury, Plaintiffs, too, are entitled to proceed. Pls.' Resp. at 53. This is simply not true. Courts regularly dispose of cases like this one, which involves the application of reasonable, viewpoint neutral criteria to exclude certain forms of expressive activity in nonpublic forums, at the motion to dismiss stage. *See, e.g.*, *Oberwetter v. Hilliard*, 680 F. Supp. 2d 152, 169 (D.D.C. 2010).

which it has found compelled speech violates the First Amendment and cases (like *Rumsfeld* and others relied upon by Plaintiffs) where an entity is required to "accommodate" another's message, but where "the accommodation does not sufficiently interfere with any message" of the accommodator. 547 U.S. at 63-65. "The compelled-speech violation[s]" found in the former, the Court explained, "resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Id*. at 63. Thus, in *Miami Herald Publishing Co. v. Tornillo*, the Court "recognized that 'the compelled printing of a reply [from a candidate to an editorial] . . . tak[es] up space that could be devoted to other material the newspaper may have preferred to print.'" *Rumsfeld*, 547 U.S. at 64 (quoting *Tornillo*, 418 U.S. at 256). *See also id*. (discussing *Pac. Gas & Elec. Co.*, in which plurality found that forcing utility company to send third-party newsletter on its billing envelope "interfered with the utility's own message" in violation of the First Amendment).[3] The same logic applies to a debate, where the inclusion of additional, extraneous participants necessarily takes up time that could be used by candidates with a legitimate chance of becoming President to educate the public, and also affects those candidates' own messages. Indeed, Plaintiffs make no secret that this is precisely what they hope that their participation will do. *See Compl*. ¶¶ 45, 46, 106, 131.

Plaintiffs also acknowledge that forcing some candidates to debate others who are unable to meet CPD's neutral participation criteria may convey the message that all of the participants view the others as credible presidential candidates. Pls.' Resp. at 33. Remarkably, Plaintiffs suggest that the damage done to the First Amendment rights of candidates who appear under compulsion could be cured if those candidates affirmatively and expressly "explain[] that their debate participation was required by federal law." *Id*. In other words, Plaintiffs concede that the candidates' messages would implicitly be altered, but bizarrely suggest that this can be addressed if the candidates *explicitly* alter their message to announce that they are present under legal compulsion. In doing so, Plaintiffs illustrate precisely why, if they succeed on their claims, any

---

[3] The DNC's and Obama's motion to dismiss cites both *Pacific Gas* and *Tornillo* repeatedly; Plaintiffs' response fails to mention either, much less explain why they do not require dismissal of Plaintiffs' claims.

remedy would necessarily violate the First Amendment prohibition against compelled speech. Plaintiffs' proposed "cure" also ignores that the compelled speech at issue is not just the message sent about the strength of their candidacy, but also the lengthy debate that would follow wherein candidates with extensive public support would be compelled to debate others that objectively lack broad public support and have no realistic chance of being elected. As established by the cases discussed above, any of this would offend the First Amendment.

Plaintiffs' assertion that the motions to dismiss "ignore this Circuit's 'competitor standing' cases," Pls.' Resp. at 39, is wrong on all fronts. First, several of the cases that Plaintiffs cite in support are from the First and Second Circuit. In the sole D.C. Circuit case, the opinion expressly states that this Circuit has "never completely resolved this thorny issue," before finding that none of the plaintiffs had standing. *Gottlieb v. FEC*, 143 F.3d 618 (1998) (internal quotation marks omitted). Nevertheless, DNC's and President Obama's motion to dismiss discussed *Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000), in detail, explaining why it cannot support Plaintiffs' standing. DNC & Obama Mot. to Dismiss (ECF No. 37) 13-15. In particular, *Buchanan* recognized a limited form of "competitor standing" where "political actors may bring suit when they are competitively disadvantaged by *government* action." *Buchanan*, F. Supp. 2d at 63 (emphasis added).[4] The D.C. Circuit's discussion about the "thorny issue" of competitor standing in *Gottlieb* similarly confined its discussion to injuries that result when "the *government* has bestowed [an] assertedly illegal benefit" on a competitor. 143 F.3d at 621 (emphasis added). As Plaintiffs concede, "Defendants are not government actors." Pls.' Resp. at 48.

Finally, Plaintiffs characterize the First Amendment arguments raised in Defendants' motions to dismiss as "frivolous," but it is clear that the D.C. Circuit would disagree. Twice now, when that court has had the opportunity to consider a debate challenge, it has expressed serious concerns about the constitutionality of any meaningful relief that could be ordered to address the

---

[4] For the purposes of this discussion, *Natural Law Party of the United States of America*, 111 F. Supp. 2d 33 (D.D.C. 2000), is indistinguishable from *Buchanan*. In both, the government action causing the injury conferring standing was the FEC's disposal of the plaintiffs' complaints. *Buchanan*, 112 F. Supp. 2d at 63; *Natural Law Party*, 111 F. Supp. 2d at 41 ("[P]laintiffs' suit . . . must be based on . . . the FEC's dismissal of [their] administrative complaint."). *See also* DNC & Obama Mot. at 13-15.

harms allegedly suffered by third party candidates desiring to be included in the debates. *See Johnson*, 829 F.2d at 161 n.22 (finding the First Amendment "forbid[s]" any requirement that candidates have access to successful campaigning forums such as newspaper endorsements or participation in debates) (citing *Tornillo*, 418 U.S. 241, 257 (1974)); *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) ("[I]f this court were to enjoin the CPD from staging the debates or from choosing debate participants, there would be a substantial argument that the court would itself violate the CPD's First Amendment rights."). For all of these reasons, and the reasons discussed in the Defendants' initial motions to dismiss, the Complaint should be dismissed in its entirety due to lack of standing.

**B.      The Sherman Act Does Not Apply to Political Activity.**

Defendants moved to dismiss Plaintiffs' antitrust claims on the ground that the Sherman Act does not apply to noncommercial political activity like the presidential debates. Plaintiffs responded that the Sherman Act *must* apply to political activity because there is no textual exception excluding it. Pls.' Resp. at 5-6, 35. But there *is* such an exception, and it is plain and unambiguous: the Act applies *only* to "restraint[s] of trade or commerce." 15 U.S.C. §§ 1, 2. *See, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 338 (7th Cir. 2012) ("As the Supreme Court made clear long ago, however, the Sherman Act *was intended for, and thus only applies to, commercial transactions*.") (citing *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 492-93 (1940) (emphasis added); *Apex Hosiery*, 310 U.S. at 495 (Court has not applied the Sherman Act in any case unless it found restraint on "commercial competition in the marketing of goods or services"); *Marjorie Webster Jr. Coll. Inc. v. Middle State Ass'n of Colleges & Secondary Schs., Inc.*, 432 F.2d 650, 654 (D.C. Cir. 1970) ("[T]he proscriptions of the Sherman Act were 'tailored . . . for the business world.'") (citations omitted).[5]

---

[5] Plaintiffs' own authority confirms this limitation. *See, e.g.*, *Associated Press*, 326 U.S. at 15 (cited by Plaintiffs as a "landmark" and "first cousin" to their political activity-based claims, but which holds that "[t]he Sherman Act was specifically intended to prohibit *independent businesses* from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete") (emphasis added).

As explained by the leading treatise on the Sherman Act, "had Congress intended for the antitrust laws to reach political acts or any part of the political process, it would almost certainly have drafted a far different statute than the one it in fact did." 1B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 260c, at 173 (4th ed. 2013). Indeed, Plaintiffs cannot cite to a single case that suggests that the political process, particularly, the pursuit of the nation's highest office, is "trade or commerce" subject to regulation by antitrust law.[6] To the contrary, scores of cases establish the opposite. *See, e.g.*, *Sheppard v. Lee*, 929 F.2d 496, 498 (9th Cir. 1991) ("[N]either the business of conducting the government nor the holding of a political office constitutes "trade or commerce" within the meaning of the Sherman Act."); *Council for Emp't & Econ. Energy Use v. WHDH Corp.*, 580 F.2d 9, 12-13 (1st Cir. 1978) (rejecting antitrust application where case involved "political opponents, not commercial competitors; and political objectives, not marketplace goals" and upholding dismissal without leave to amend).[7]

In *Sheppard*, the Ninth Circuit squarely addressed—and rejected—antitrust claims based on competition for political office. 929 F.2d 496. Leo Sheppard was a former employee of Apache County, Arizona, who was fired by the Apache County Board of Supervisors after he announced his intention to run for an occupied seat on the Board. *Id.* at 497. Mr. Sheppard was fired under an amendment to the county's employee rules and regulations—enacted by the Board just after Mr. Sheppard announced his candidacy—that terminated employment for any candidates for salaried elected office. Mr. Sheppard sued for antitrust violations under the Sherman Act. The Ninth Circuit affirmed dismissal of the case, on grounds that the Sherman Act did not apply to government or competition for office:

---

[6] Instead, Plaintiffs offer platitudes like "Politics and business are synonyms, not antonyms" and one-hundred-year-old anecdotes about the importance of money in politics. Pls.' Resp. at 7. Neither helps their case.

[7] Plaintiffs' attempts to distinguish *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961), and its progeny also do not help them. Pls.' Resp. at 35-38. *Noerr* and the cases cited by Plaintiffs hold only that genuine attempts to influence government action, even when that political activity is undertaken by businesses, for business purposes, are beyond the Sherman Act, with few limitations not applicable here. *See, e.g.*, *Noerr*, 365 U.S. at 137.

> *The antitrust laws pose no barriers to the suppression of competition for the holding of any particular office or position, elected or otherwise.* Thus, the founder of a company may appoint himself CEO for life, a law firm may impose restrictions on who may run for senior partner, and—as in the present case—a Board of Supervisors may disqualify certain persons from running for the position of County Supervisor, all without violating the antitrust laws. Because limiting the opportunity to hold a political office is no more a violation of the antitrust laws than is conducting the government in a non-competitive manner, Sheppard's claim is wholly unmeritorious.

*Id.* at 499-500 (emphasis added).

The *Sheppard* court, like many others, also rejected the argument now made by Plaintiffs: that politics, and the pursuit of political office, are trade or commerce because they tangentially involve money. *Id.* (rejecting argument that position of County Supervisor "involves commercial activity, because a County Supervisor receives a salary in exchange for the performance of his duties"). *See also*, *e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 (1988) ("[A]ntitrust laws should not regulate political activities 'simply because those activities have a commercial impact'"). Plaintiffs fail to address these cases, and they have not, and cannot provide any authority to support their contrary position.[8] Nor do they address the fact that their interpretation of "trade or commerce" would apparently swallow any noncommercial entity— including churches, schools, and charities—because those entities receive and spend money, employ workers, or have other financial effects. *See* 1B Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 260c, at 174 (Congress did not intend antitrust laws "to regulate political markets, charity, or other noncommercial affairs").[9]

As a result, the Court should decline Plaintiffs' invitation to rewrite the Sherman Act and expand it beyond its text, judicial precedent, leading commentary, and common sense. Antitrust does not apply to noncommercial political activity, and cannot be used to force Defendants to debate Plaintiffs, or penalize them for deciding not to.

---

[8] Plaintiffs cite *Allied Tube*, but only in their discussion of *Noerr*. Pls.' Resp. at 37-38.

[9] Not only does the Sherman Act not apply to political activity, but the FEC regulates such conduct through a complex scheme. Accepting Plaintiffs' argument to stretch the antitrust laws beyond their natural limits will undermine the FEC's regulatory authority. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (finding antitrust laws do not apply when a regulatory scheme governs conduct).

### C.     Plaintiffs Lack Antitrust Standing.

In addition to moving to dismiss all of Plaintiffs' claims on the ground that Plaintiffs lack Article III standing, Defendants have moved to dismiss Plaintiffs' antitrust claims in particular because (1) Plaintiffs have not alleged an antitrust injury, (2) there is no causal connection between their alleged injuries and Defendants alleged acts, and (3) Plaintiffs' alleged harm is too speculative. Each is required to establish antitrust standing. *See* DNC & Obama Mot. at 16-21. *See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Klein v. Am. Land Title Ass'n*, 926 F. Supp. 2d 193, 199 (D.D.C. 2013), *aff'd*, 560 F. App'x 1 (D.C. Cir. 2014); 2A Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335, at 77 (4th ed. 2013). Despite filing a 55 page opposition, Plaintiffs use the term "antitrust standing" only once—to describe the arguments in Defendants' motions to dismiss—and fail to address the substantive elements of antitrust standing entirely. Instead, Plaintiffs' standing arguments are wholly conclusive and relate at most to proving Article III standing, not antitrust standing. *See* Pls.' Resp. at 22 ("Plaintiffs have adequately pled and demonstrated standing . . . ."); *id.* at 38-39 (citing only non-antitrust "competitor standing" cases); *id.* at 43 (same).

Because Plaintiffs fail to address these arguments in response, they have waived any opposition. *See, e.g.*, *Harris v. CitiMortgage, Inc.*, 878 F. Supp. 2d 154, 163 (D.D.C. 2012) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quotation omitted). Nevertheless, it is worth reiterating why Plaintiffs' failure to establish any one of these elements requires dismissal of its antitrust claims.

#### 1.     Plaintiffs' alleged injuries, if any, result from competition-enhancing conduct.

"[A]ntitrust laws were passed for 'the protection of *competition*, not *competitors*.'" *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)). Thus, an antitrust

injury must stem from a "competition-*reducing*" effect of a defendant's behavior, not just an injury to a specific competitor. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). Plaintiffs' alleged injuries are vague, but at their core is Plaintiffs' belief that major party candidates should be forced to debate them and that their political messages should be included with Defendants' political messages. *See also* Compl. ¶¶ 89-92 (alleging their exclusion from the debates cost Plaintiffs opportunities to communicate with the public, increased media exposure, increased donations, matching federal funds, and the salaries they would have earned if included in the debates and subsequently elected). But those are personal injuries to Plaintiffs caused by Plaintiffs' inability to effectively compete with Defendants prior to the CPD-sponsored debates, and not the market-wide injuries to competition caused by Defendants' alleged acts required to prove antitrust standing. And as explained previously, DNC & Obama Mot. at 7-10, and *infra*, Defendants have no duty to deal with Plaintiffs.

Worse yet, the effects that Plaintiffs allege result from Defendants' conduct are all competition-*enhancing*, not competition-reducing. Although Plaintiffs initially claim they have been harmed because voter education is reduced due to the CPD's selection criteria, Plaintiffs ultimately concede, as they must, that since the establishment of the CPD, there has been greater output and more competition: debates have been more frequent, have involved greater viewership, more money has been spent by candidates and their parties during elections, and both major political parties have agreed to participate (which historically was not always the case). *See* Compl. ¶¶ 45-70; *see also* Pls.' Resp. at 16-20. These benefits, which include increased voter education, underscore Plaintiffs' lack of antitrust standing.

**2.      There is no causal connection between Defendants' acts and Plaintiffs' alleged injuries.**

Not only is the conduct challenged by Plaintiffs competition-enhancing, but Plaintiffs' response makes clear that there is no causal connection between the challenged conduct and Plaintiffs' alleged injuries. *See* Compl. ¶¶ 89-92.

Plaintiffs are marginal candidates who, by their own admission, together commanded less than 1% of the popular vote in the most recent presidential election. *See id*. ¶¶ 16-17. They attempt to place the blame for poor electoral performance on Defendants' shoulders, contending that their purported exclusion from the debates "caused media coverage to wither and voters to dismiss the excluded as fringe." Pls.' Resp. at 12. At the same time, however, Plaintiffs admit that the lack of media coverage, donor funds, and voter interest predate the debates, which come only at the tail end of a long campaign.[10] *See* Compl. ¶ 46 ("The media gives nonduopoly, non-major party candidates little or no coverage, and they cannot afford significant, if any, national advertising."). Thus, exclusion from the debates cannot be the cause of Plaintiffs' pre-debate electoral failures.

Nor can exclusion from the debates be the cause of Plaintiffs' electoral failings generally, because the vast majority of media attention, donor funds, and voter interest are committed well before the debates, which often take place as little as two weeks before the general election. In fact, as Plaintiffs allege, Donald Trump already has received "close to $2 billion worth of media attention" during the current campaign—*despite skipping some of the Republican Party candidate debates*—and Hillary Clinton has received "an estimated $746 million worth of free media time," even though the CPD debates—the "Super Bowl of politics"—for this election cycle are still another six months' away. Pls.' Resp. at 11, 24.[11] Plaintiffs' own allegations and arguments, in other words, demonstrate what would be clear to even the most casual observer of politics: Plaintiffs' alleged "harms" stem from a lack of public support for them as candidates, their parties, and their positions, and not because of the Defendants' agreement to reasonable, neutral, publicly-disclosed debate criteria. *Cf. Buckley v. Valeo*, 424 U.S. 1, 94-95 (1976) (denying challenge to public funding law because "the inability, if any, of minor-party

---

[10] The 2012 presidential debates were held on October 3, 16, and 22, with the vice presidential debate on October 11. *See* Compl. Ex. 1 at 1.

[11] This allegation, like many others in Plaintiffs' response, is outside the scope of the Complaint, and is not properly considered in an opposition to a motion to dismiss. *See* Fed. R. Civ. P. 12(d). But to the extent it is considered by the Court, it only undermines Plaintiffs' arguments.

candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions").

### 3.    Plaintiffs' alleged damages are too speculative.

Plaintiffs allege that their damages include their share of $1 billion in lost advertising value, based entirely on their assertion that, because the debates are like the "Super Bowl of politics," their air time value can be roughly compared to the per-minute rate of advertising in the NFL Super Bowl.[12] Not only is this analogy completely outside the Complaint, it is hard to imagine a more speculative damages calculation. *See S. Pac. Commc'ns Co. v. AT&T Co.*, 556 F. Supp. 825, 1090 n.336 (D.D.C. 1982) (denying recovery of damages as too speculative and explaining that a plaintiff may make a "'reasonable estimate'" of the amount of antitrust damages "provided that the plaintiff's estimate is 'based on relevant data' and it is shown that the damages claimed were 'not . . . attributable to other causes'") (quoting *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264 (1946) (cited by Plaintiffs)).[13]

To make matters worse, Plaintiffs also demand the salaries Johnson and Stein would have received if elected, despite the sheer implausibility that either could have won the Presidency, and the impossibility that both could have won it at the same time. *See* Compl. ¶¶ 89-92. Plaintiffs also ask for damages to compensate them for the loss of "millions of dollars in campaign contributions" they believe they would have garnered. *Id.* ¶ 90. In sum, Plaintiffs are asking this Court to believe that, absent Defendants' alleged actions, (1) Plaintiffs would have been eligible to participate in the debates, (2) Plaintiffs would have performed so well in those debates that voters in staggeringly large numbers would have transferred their support to them (despite their total lack of popular support for the preceding months or years), (3) that support would have led to significant sums of campaign donations measured by Super Bowl advertising proceeds, and (4) that support and those donations would have ultimately translated into

---

[12] Apart from being outside the scope of the Complaint, Plaintiffs' damages calculation is unsupported by any authority, and fails to consider the substantial and obvious economic differences between the debates and the Super Bowl.

[13] Plaintiffs cite *Bigelow* for the argument that they are allowed to proceed with their back-of-the envelope "Super Bowl"-based damages, but *Bigelow* prohibits damages "based on speculation or guesswork." 327 U.S. at 264.

Plaintiffs garnering a majority of electoral college votes, and finally winning the Presidency. But antitrust standing cannot be maintained on such compounding wild speculation. *Common Cause v. Dep't of Energy*, 702 F.2d 245, 252 (D.C. Cir. 1983) (An "assumption [that] is conjectural at best . . . cannot support standing."); *Kroger Co. v. Sanofi-Aventis*, 701 F. Supp. 2d 938, 959 (S.D. Ohio 2010) (plaintiff lacked antitrust standing where asserted injury was speculative). Plaintiffs' antitrust claims should be dismissed.

### D.    Plaintiffs Fail to State Antitrust Claims.

Although jumbled together in their response, Plaintiffs appear to attempt to allege separate claims under both Section 1 and Section 2 of the Sherman Act. Plaintiffs allege under Section 1 that Defendants' use of the candidate selection criteria for presidential debates is the result of a "combination and conspiracy" to restrain interstate commerce. Compl. ¶¶ 31-92. Plaintiffs allege under Section 2 that by using and agreeing to the candidate selection criteria in presidential debates, Defendants have monopolized, attempted to monopolize, and conspired to monopolize indecipherable markets. *Id.* ¶¶ 93-108.

Defendants explained in their motion to dismiss why both sets of claims fail—Plaintiffs' claims do not qualify for per se treatment, have not alleged a plausible conspiracy or valid antitrust market, and do not qualify under the essential facilities doctrine. Plaintiffs largely ignore these arguments, implicitly recognizing their strength. Instead, they attempt to pivot, making entirely new arguments not supported by the allegations in their Complaint, and unsustainable under the case law. For the reasons that follow, Plaintiffs' arguments cannot save their claims.

### 1.    Plaintiffs' Section 1 and Section 2 claims fail for lack of a cognizable antitrust market.

Having utterly failed to allege even a single valid antitrust market (let alone the three or five "markets" they incoherently and inconsistently refer to in their Complaint), Plaintiffs now attempt to avoid this requirement by invoking inapposite case law to suggest that no market definition is required. Pls.' Resp. at 45-47.

The Court should have no trouble disposing of this argument. Although Plaintiffs concede that their Section 1 claims cannot meet the per se standard (despite referring to them repeatedly as "per se" claims in their pleading, *see* Compl. ¶¶ 8, 10, 12), and instead now assert that their Section 1 claims should be analyzed under the rule of reason (*see* Pls.' Resp. at 45), this sudden change of course cannot save Plaintiffs' Section 1 claim. Section 1 claims under the rule of reason are subject to a higher pleading standard, *see Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006), and require allegations of a properly defined antitrust market. *See, e.g.*, *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 53 (D.D.C. 2008) ("A rule of reason analysis almost always begins with the definition of the relevant market, without which there is little context to discuss competition, anticompetitive effects, or procompetitive benefits."). Likewise, the case law is clear that market definition is vital to Section 2 claims. *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 1011, 1015 n. 3 (D.C. Cir. 1984) (An antitrust market is "the market in which an entity's power is measured to determine whether the entity is a monopolist"). Accordingly, Plaintiffs bear the burden to plead a relevant market for both their Section 1 and 2 claims, including all relevant substitutes. *Meijer*, 572 F. Supp. 2d at 54, 56. Failure to allege a viable market requires dismissal. *See, e.g.*, *Concord Assocs., L.P. v. Entm't Properties Trust*, --- F.3d ---, 2016 WL 1075947, at *4 (2d Cir. Mar. 18, 2016) ("[T]o survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market.") (quotation omitted).

In *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), the Court recognized a rare exception to the rule that a plaintiff must allege a valid antitrust market, not applicable here: market definition is not required "where the actual anticompetitive effects of a restraint are clear." *Meijer*, 572 F. Supp. 2d at 54. The *Indiana Federation of Dentists* exception is narrow and applied sparingly. *Id.*; 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 531, at 255 (4th Ed. 2013). For example, actual anticompetitive effects that could trigger the exception include clear evidence of price increases or restraints on competition, which is not implicated here. *See*

*Indiana Fed'n of Dentists*, 476 U.S. at 451-52. Instead of demonstrating clearly anticompetitive effects, Plaintiffs acknowledge that the challenged conduct has resulted in greater output and more competition: more frequent debates with both major parties participating, viewed by larger audiences, and with more money spent.[14] *See* Compl. ¶¶ 45-70. Increased output and vigorous competition are hallmarks of competition-enhancing conduct. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 114 (1984) (citing increased output and reduced price as proof of procompetitive efficiencies). As a result, *Indiana Federation of Dentists* does not apply and Plaintiffs are required to sufficiently allege a cognizable antitrust market.

To the extent Plaintiffs can be found to allege any "market" at all, it consists of a single product—CPD-sponsored debates—with no alternatives. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, (1956) (relevant antitrust market must include all "commodities reasonably interchangeable by consumers for the same purposes"); *Concord Assocs., L.P*, --- F.3d ---, 2016 WL 1075947, at *5 ("Merely asserting that a commodity is in some way unique is insufficient to plead a relevant market. Rather, an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market.") (alteration in original omitted) (quotation omitted). Plaintiffs' market must include all reasonable substitutes, including other ways to engage with voters and publicize their views. *See E.I. du Pont*, 351 U.S. at 395. Plaintiffs have failed to include any market substitutes, failed to address this point in their response, and their market definition fails as a result.

### 2.    Plaintiffs' Section 1 and Section 2 conspiracy-based claims fail for lack of a plausible conspiracy.

Plaintiffs' Section 1 claim and their conspiracy to monopolize Section 2 claim hinge on proof of a plausible conspiracy, but Plaintiffs have not provided any of the types of specific, non-conclusory factual allegations that the Supreme Court has required "to 'state a claim to relief that

---

[14] Plaintiffs do allege that output is lowered in one respect, because Plaintiffs' "voter education" is decreased. Pls.' Resp. 2. But Plaintiffs' decreased voter education—that is, the denial of free air time to publicize their views—is a personal injury, not a market-wide decrease, and thus is insufficient to support an antitrust claim. *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 487-88 (D.C. Cir. 1996) (finding no antitrust injury where alleged violation increased, rather than decreased, competition, even though it personally injured plaintiff). *See also supra*.

is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs attempt to sidestep the pleading standard established by *Twombly* and *Iqbal* by resorting to the refrain that their antitrust claims are "heavily fact-bound" and will require "testimonies from political, economic, and First Amendment experts" and thus, are not susceptible to a motion to dismiss. Pls.' Resp. at 7 (citing *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918)). But Plaintiffs fail to cite any authority that can support their extraordinary position—that "heavily fact-bound" cases are excused from the requirement that a plaintiff's allegations meet the plausibility test.

The case Plaintiffs cite in support of their argument, *Board of Trade*, is a century old[15] and made irrelevant by *Twombly*, which was decided precisely because the Supreme Court recognized that "the unusually high cost of discovery in antitrust cases" required a higher pleading standard than mere possibility. *Twombly*, 550 U.S. 558 (quotation omitted). That standard, which was extended to all civil cases in *Iqbal*, is particularly apt here, where Plaintiffs allege an implausible, decades-long conspiracy between bitter political rivals, but provide no details as to "the basic questions: who, did what, to whom (or with whom) where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *Iqbal*, 556 U.S. 662 (2009).

Plaintiffs characterize the MOU as a "smoking gun," Pls.' Resp. at 38, but the MOU is not proof of a conspiracy, which requires proof that each defendant made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted). Most of the Defendants (the CPD, RNC, DNC, Fahrenkopf and McCurry) are not even parties to the MOU, thus the MOU cannot show their "conscious commitment" to any common scheme established in it. *See Twombly* at 555, 557 (antitrust plaintiff must plead facts demonstrating an "entitle[ment] to relief" as to each named defendant); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (citation omitted) (complaint "must allege that each individual

---

[15] Plaintiffs' citation to the case, which says it was decided in 1946, Pls.' Resp. at 7, is mistaken.

defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it"). Nor is there any evidence in the MOU of any agreement to achieve an unlawful objective. Plaintiffs' assertions that the MOU is "unlawful," Pls.' Resp. at 55, "arbitrary and unreasonable," *id*. at 2, and was signed "for the purpose of crippling or destroying competition," *id*. at 2, 43, are legal conclusions unsupported by plausible facts and "not entitled to a presumption of truth." *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 33 F. Supp. 3d 14, 21 (D.D.C. 2014) (dismissing Sherman Act conspiracy claims based on conclusory allegations "not entitled to a presumption of truth").

Instead, the text of the MOU supports only the obvious alternative explanations that *Twombly* requires plaintiffs—but which these Plaintiffs refuse—to address. *See Twombly*, 550 U.S. at 567 (allegations of conspiracy are deficient if there are "obvious alternative explanation[s]" for defendant's behavior). On its face, the MOU indicates that each party to it unilaterally decided to participate in a series of debates, subject to non-discriminatory debate criteria designed to include only serious contenders for election. *See* Compl. Ex. 1. Rather than being exclusionary, Section 3 of the MOU provides that *if third-party candidates meet the MOU's selection criteria, "those candidates shall be included in the debates.*" Compl. Ex. 1, at 2 (emphasis added). That selection criteria is reasonable and necessary, and has been approved by other courts. *See, e.g.*, *Buchanan*, 112 F. Supp. 2d at 75 ("It is difficult to understand why it would be unreasonable or subjective to consider the extent of a candidate's electoral support prior to the debate . . . ."). In addition, after having negotiated even the smallest details of their joint debates, it is reasonable and necessary to the purposes of the agreement that the parties to the MOU would then independently decide not to participate in other debates. *See generally* Compl. Ex. 1. Plaintiffs' conspiracy-based claims accordingly fail.

### 3.   The CPD's Debates are Not Essential Facilities.

Although their Complaint barely makes mention of an essential facility, *see* Compl. ¶¶ 97-101, in their response brief Plaintiffs heavily rely upon the doctrine in a futile attempt to save their Section 1 and 2 claims. The essential facilities doctrine is a limited exception to the general rule that there is no duty to aid competitors. *Covad Comms. Co. v. Bell Atl. Corp.*, 201 F. Supp. 2d 123, 131 (D.D.C. 2002), *rev'd in part on other grounds*, 398 F.3d 666 (D.C. Cir. 2005). Its very viability is controversial: many courts, including the Supreme Court, have not recognized it. *See, e.g.*, *Verizon Comms. Inc. v. Law Office of Curits V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (Court has not recognized the essential facilities doctrine). And as Plaintiffs' own authority clearly states, the essential facilities doctrine, or "[c]ompulsory access, if it exists at all, is and should be very exceptional." Phillip Areeda, *Essential Facilities: An Epithet In Need of Limiting Principles*, 58 Antitrust L.J. 841, 852 (19890). Although the D.C. Circuit has recognized the doctrine, it has been clear that it is only available under those rare circumstances when a plaintiff can demonstrate each of the following elements: (1) a monopolist who competes with the plaintiff controls the essential facility; (2) plaintiffs are unable practically to duplicate the facility; (3) the monopolist failed to provide access on reasonable terms; and (4) it is feasible for the monopolist to provide such access. *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1088 (D.C. Cir. 1998). Plaintiffs have not properly alleged any of those elements here, and the essential facilities doctrine does not apply.[16]

### a.   Defendants do not control an essential facility.

As a threshold matter, Plaintiffs have failed to show that Defendants are (1) monopolists[17] and (2) in competition with Plaintiffs in the alleged market.[18] Plaintiffs have

---

[16] In support of their essential facilities claim, Plaintiffs also cite, but provide no analysis of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). Not only is *Aspen* not an essential facilities case, it is not remotely factually similar to the circumstances here.

[17] To the extent that Defendants *could* hold monopoly power (being a collection of four individuals, two of whom were competing against each other for elected office, two political parties similarly opposed, and an independent commission), Plaintiffs have failed to allege facts sufficient to prove that Defendants held monopoly power within a specific market, *see supra*. And to the extent the Complaint alleges ongoing monopoly power, it is unclear how President Obama and Governor Romney play any role in preventing Plaintiffs' future access to debates.

further failed to allege facts to show that CPD-sponsored debates are an essential facility that must be shared. An essential facility is one that is "essential for competition in a broader market," and would make no economic sense to duplicate. *U.S. Telecom Ass'n v. F.C.C.*, 290 F.3d 415, 426 (D.C. Cir. 2002) ("The doctrine's basic idea is that where one firm controls some facility (such as a bridge) that is essential for competition in a broader market, and it would make no economic sense for competitors to duplicate the facility, and certain other criteria are satisfied, the owner may be compelled to share the facility with its competitors.") (internal citation omitted).

Plaintiffs mistakenly claim, based on *Associated Press v. United States*, 326 U.S. 1 (1945), that an essential facility need only "confer[] a substantial competitive advantage on Defendants." Pls.' Resp. 24. But *Associated Press* is not an essential facilities case, and Plaintiffs misread its holding. [19] In that case, the Court held that the Associated Press's ("AP") admission policies violated Section 2 of the Sherman Act, not because membership conferred a competitive advantage that the AP was required to share, but because the policies were "designed to stifle competition" by preventing membership for newspapers who competed against existing AP members. 326 at 9-12. Under the AP By-Laws, newspapers that did not compete against existing members faced "a very simple and non-burdensome road for admission," without payment or onerous terms and could be voted in by a simple vote of the board of directors. *Id.* at 9. On the other hand, papers that competed with an AP member had to pay a significant assessment, agree to assist its AP-member competitor in getting rights to any other news or picture services to which it belonged, and be voted in by a majority vote of all members. The key to the Court's analysis was that the admission criteria *differed* if the newspaper was a competitor. The Court found that the only purpose for the difference was to prevent competition in the newspaper

---

[18] Plaintiffs have failed to allege facts to show how Defendants were in competition with Plaintiffs in the market for "sponsoring, conducting, and establishing selection criteria for participation in presidential debates in the multi-billion dollar business of campaigning for the presidency." Pls.' Resp. at 23.

[19] Indeed, the case never uses the phrase "substantial competitive advantage." *See Associated Press*, 326 U.S. 1.

market, and thus the By-Laws violated the Sherman Act.[20] *Id.* at 10-12. Even then, the Court did not force the AP to welcome all applicants and did not hold that membership was essential to compete. *Id.* at 21.

Here, the CPD-sponsored debates apply the *same* participation criteria to *all* candidates, so there is no discriminatory treatment and no improper motive can be inferred. Moreover the CPD-sponsored debates are not essential to competition. The fact that Plaintiffs have not participated in CPD-sponsored debates has not prevented them from campaigning, communicating with voters, or otherwise pursuing electoral goals. *See Johnson*, 829 F.2d at 165 ("The exclusion of petitioners from the debates did not prevent them from waging an effective campaign."). Because Plaintiffs were able to campaign, albeit without the benefit of free-riding on Defendants' popularity, the better mousetrap—in this case, the CPD-sponsored presidential debates—is not an essential facility. *See SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1084 (D. Colo. 2013).

### b. Plaintiffs can practically or reasonably duplicate the presidential debates.

Plaintiffs argue that because of the MOU, they were unable to duplicate the presidential debates. But Plaintiffs offer no legal support for this position. Duplication must make "*no economic sense.*" *U.S. Telecom Ass'n*, 290 F.3d at 426; 3B Areeda & Hovenkamp, *Antitrust Law* ¶¶ 771-73 at 202-84 (4th ed. 2015). Here, Plaintiffs were free to organize their own debates or campaign in any other manner they deemed appropriate. In other words, exclusion from the debates did not prevent Plaintiffs from courting media exposure, recruiting volunteers, staking out ideological positions, fundraising and otherwise "waging an effective campaign," which Plaintiffs had been doing with success without participating in the CPD-sponsored debates. *See Johnson*, 829 F.2d at 165. Indeed, Plaintiff Stein admits that she has received matching funds

---

[20] Modern commentators have criticized even that narrow holding. *See* 3B Areeda & Hovenkamp, *Antitrust Law* ¶ 770e, at 199 (4th ed. 2013) ("[W]e are largely unpersuaded that §2 should be applied here."). No authority supports the expansive holding that Plaintiffs read into *Associated Press.*

from the FEC and Plaintiffs and/or their candidates have, in prior elections, qualified on the ballots of at least 28 states. *See* Compl. ¶¶ 16-19.

        **c.**      **Plaintiffs have access to the presidential debates on reasonable terms.**

The essential facilities doctrine depends on "the unavailability of access to the 'essential facilities'; *where access exists, the doctrine serves no purpose*.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (emphasis added).

In this case, Plaintiffs have a means of access to the CPD-sponsored debates, it is the same means afforded President Obama and Governor Romney, which are nearly identical to the requirements used by the League of Women Voters and are designed to move a candidate from a remote mathematical chance of winning (qualifying on the ballot of a theoretical majority of states) to a true possibility (support from at least 15% of the electorate). Unlike the discriminatory By-Laws in *Associated Press*, the CPD's debate criteria apply equally to all candidates—candidates who meet the criteria are invited to participate, no matter what party they belong to, and those who do not meet the criteria are not invited. *See* 326 U.S. at 9-12. Those criteria have been upheld by other courts as reasonable. *Buchanan*, 112 F. Supp. 2d at 74; *LaBotz v. FEC*, 889 F. Supp. 2d 51, 63 (D.D.C. 2012). Plaintiffs are not entitled to special access without meeting the same requirements, or access "in a manner which [they] prefer[ ]."[21] *See Cyber Promotions, Inc., v. Am. Online, Inc.*, 948 F. Supp. 456, 460 (E.D. Pa. 1996) (antitrust law did not require giving advertiser "access to AOL's system in a manner which it prefers").

        **d.**      **Including Plaintiffs in presidential debates was not feasible.**

"The antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 980, 1009 (D.C. Cir. 1984). Further, sharing a

---

[21] Plaintiffs do not, as they allege, have constitutionally-guaranteed access to the debates free from any qualifications. Pls.' Resp. at 31 ("Freedom to campaign for the presidency, including participation in presidential debates, . . . is guaranteed by the Constitution . . . ."). Nor are Plaintiffs correct that "Freedom to campaign for the presidency, including participation in presidential debates, means freedom for all and not for some." *Id. See* U.S. Const. art. II, § 1 (limiting eligibility for presidential office to natural-born citizens 35 years and older).

facility is not feasible when a defendant has a legitimate business justification to restrict access. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1379 (9th Cir. 1992); s*ee Covad*, 201 F. Supp. 2d at 131-32 ("Defendant's conduct must also lack a legitimate business justification in order to be unlawful or exclusionary."); Philip E. Areeda, 58 Antitrust L.J. 841, 852 (1989) ("[L]egitimate business purpose always saves the defendant.").

Even assuming arguendo, that the antitrust laws could apply to the CPD-sponsored debates, forcing the CPD to include Plaintiffs despite their lack of support would be impractical, and CPD has legitimate reasons to establish non-discriminatory debate criteria to ensure only viable candidates are included. As recognized by the Supreme Court, CPD could not feasibly provide Plaintiffs access to the debates without "undermin[ing] the educational value and quality of debates." *Forbes*, 523 U.S. at 681; *see also Chandler v. Georgia Pub. Telecomm's Comm'n*, 917 F.2d 486, 489 (11th Cir. 1990) (limiting debate to front-runners "is appropriately made by the programmers undertaking to provide an educational program of sufficient interest to attract viewers"). Compelling the major party candidates to participate in such debates also threatens the very existence of the debates. *See Trinko*, 540 U.S. at 407-08 (forced sharing creates a disincentive for businesses). *See also Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991) (major parties "might decline to participate in debates that do not present them as the two salient candidates, thus depriving the debates" of the value that Plaintiffs seek and Defendants provide); *Fulani v. Brady*, 729 F. Supp. 158, 163 (D.D.C. 1990) ("Indeed, if such a debate were staged, this Court maintains serious doubt whether major-party candidates—who presumably would be the media draw in the first place—would participate."); Compl. ¶¶ 34d, 50 (admitting that major candidates have refused to debate third-party candidates).

Plaintiffs' only response is to assert their own legitimacy as candidates and cite a number of political commentators' calls for greater debate participation—none of which are in their Complaint—in the mistaken view that such opinions are relevant to deciding a motion to dismiss under *Twombly*. Pls.' Resp. at 28 (quoting interviews and articles from political pundits Oliver North and George Will, and former FEC chairman Scott Thomas). Certainly, when the *Twombly*

Court encouraged judges to consider the "the considered views of leading commentators" in identifying "facts that are suggestive enough to render a § 1 conspiracy plausible," 550 U.S. at 556, they did not mean to give carte blanche to the opinion of political commentators about factual allegations on any subject, especially when those opinions are not included in the complaint. *See* Fed. R. Civ. P. 12(d). But apart from being irrelevant, the commentators' opinions merely say that more participation may be good; they do not establish that including an unlimited number of candidates (so long as they qualify for a theoretical electoral college majority) is feasible or not detrimental to the CPD's mission or that Defendants lack a legitimate business reason for establishing what courts have recognized is appropriate debate criteria.

For all of these reasons, Plaintiffs' essential facilities argument fails.

**E.      Plaintiffs Fail to State a Claim Under the First Amendment.**

Plaintiffs admit that "Defendants are not government actors," and that "in ordinary cases" this would sink their First Amendment claims, Pls.' Resp. at 48, but incorrectly argue that this case is the exception. Not only is none of the authority that they cite in support analogous, Plaintiffs' arguments are directly contrary to binding Supreme Court and D.C. Circuit precedent.

This case is not analogous to *Marsh v. State of Alabama,* 326 U.S. 501 (1946), in which the Court found the First Amendment applicable because a private party controlled a company town, and with it, unquestionably "essentially *public* forums." *Columbia Broad.*, 412 U.S. at 134 (emphasis added). As discussed, the Court has found that debates are, at best, "*nonpublic* forum[s]"—even when sponsored by a state actor. *Forbes*, 523 U.S. at 669, 677. *See also DeBauche v. Trani*, 191 F.3d 499, 508-09 (4th Cir. 1999) (explaining that, in contrast to the operation of a town as in *Marsh*, which is "a function that is traditionally the exclusive prerogative of government," "[t]he hosting of political debates . . . is not" and "could never be . . . because the First Amendment protects private parties' rights to put on (and select the content of) debates") (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569-70 (1995); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994)).

Plaintiffs' reliance on *Shelley v. Kraemer*, Pls.' Resp. at 49-50, is similarly misplaced. Given that the Court has held that determining which candidates may participate in a debate based on the application of neutral criteria is itself evidence that the forum created is a "nonpublic forum" from which candidates may be excluded by application of that criteria, *Forbes*, 523 U.S. at 690, it would be nonsensical to find that an agreement to abide by the CPD's criteria gives rise to a First Amendment claim against non-state actors for doing precisely what the Court has held even state actors may constitutionally do.

Finally, as noted in the motion to dismiss, the D.C. Circuit has previously rejected the argument that exclusion from presidential debates is comparable to exclusion from the Jaybird primaries, as in *Terry v. Adams*, 345 U.S. 461 (1953). *See* DNC & Obama Mot. at 40-41. Plaintiffs provide no reason for disregarding that precedent.

**F.      Plaintiffs Fail to State a Claim Under D.C. Tort Law.**

The motions to dismiss ably addressed Plaintiffs' tort arguments and nothing in Plaintiffs' response undermines the arguments for dismissal. *See* CPD Mot. to Dismiss (ECF No. 40) at 9; RNC Mot. to Dismiss (ECF No. 38-1) at 18-19; Romney Mot. to Dismiss (ECF No. 39-1) at 7-8. As in the Complaint, Plaintiffs' response fails to identify, with any reasonable or plausible specificity, the business relationships that the Defendants (except President Obama and Governor Romney) are alleged to have disrupted.  For these reasons, and all of the reasons set forth in the motions to dismiss, this claim, too, cannot be sustained.

### III.      CONCLUSION

For the reasons set forth in Defendants' motions to dismiss, as well as discussed herein and in the other Defendants replies in support of their motions, which the DNC and President Obama adopt to the extent applicable, the Court should dismiss Plaintiffs' Complaint in its entirety, with prejudice.

DATED:  May 3, 2016.

Respectfully submitted,

By:/s/*Elisabeth C. Frost*
      Robert F. Bauer, Bar No. 938902
      RBauer@perkinscoie.com
      Marc E. Elias, Bar No. 442077
      MElias@perkinscoie.com
      Graham Wilson, Bar No. 986796
      GWilson@perkinscoie.com
      Elisabeth C. Frost, Bar No. 1007632
      EFrost@perkinscoie.com
      **PERKINS COIE LLP**
      700 Thirteenth Street, N.W., Suite 600
      Washington, D.C. 20005-3960
      Telephone:  202.654.6200
      Facsimile:  202.654.6211

      Shylah R. Alfonso (pro hac vice)
      SAlfonso@perkinscoie.com
      **PERKINS COIE LLP**
      1201 Third Avenue, Suite 4900
      Seattle, WA 98101-3099
      Telephone:  206.359.8000
      Facsimile:  206.359.9000

*Attorneys for Defendants*
*Democratic National Committee and*
*Barack Obama*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2016, I electronically filed the foregoing with the Clerk of

the United States District Court for the District of Columbia by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Respectfully submitted,


By:/s/*Elisabeth C. Frost*
Elisabeth C. Frost, Bar No. 1007632
EFrost@perkinscoie.com
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211