# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GARY E. JOHNSON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.  15-1580 (RMC)** |
| | ) | |
| **COMMISSION ON PRESIDENTIAL** | ) | |
| **DEBATES,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## AMENDED OPINION[1]

The Libertarian and Green Parties and their political candidates sought, and failed to receive, invitations to privately-sponsored presidential debates in 2012.  They now seek invitations to this year's presidential debates, claiming that the rules that bar their participation violate antitrust law.  However, because Plaintiffs have no standing and because antitrust laws govern commercial markets and not political activity, those claims fail as a matter of well-established law.  Plaintiffs also allege violations of the First Amendment, but those claims must be dismissed because the First Amendment guarantees freedom from government infringement and Defendants here are private parties.  Finally, Plaintiffs fail to allege facts that could support a claim for intentional interference with prospective business advantage.  Defendants' motions to dismiss will be granted.

## I.  FACTS

Plaintiffs are the Libertarian National Committee, which controls the U.S. Libertarian Party; Gary Johnson, the Libertarian Party's nominee for president in 2012; Gary Johnson 2012, Inc., a corporation that served as the campaign committee for Mr. Johnson in

---

[1] This Opinion was amended pursuant to the Court's August 15, 2016 Order [Dkt 55].

2012; James Gray, Mr. Johnson's 2012 vice presidential running mate; the Green Party; Jill

Stein, the Green Party's nominee for president in 2012; Jill Stein for President, the entity that

served as Ms. Stein's campaign committee in 2012; and Cheri Honkala, Ms. Stein's 2012 vice

presidential running mate.  Plaintiffs brought this suit against:  the Republican National

Committee (RNC); the Democratic National Committee (DNC); the Commission on Presidential

Debates, a nonprofit corporation founded by the RNC and the DNC (Commission); Frank

Fahrenkopf, Jr., Commission founder and co-chair; Michael McCurry, Commission co-chair;

President Barack Obama, Democratic presidential candidate in 2012; and Willard Mitt Romney,

Republican candidate for president in 2012.  The Complaint sets forth four counts:

> Count I, combination and conspiracy to restrain interstate commerce
> in violation of Section 1 of the Sherman Act;
>
> Count II, monopolization, attempt to monopolize, and conspiracy to
> monopolize in violation of Section 2 of the Sherman Act;
>
> Count III, violation of First Amendment rights of free speech and
> association; and
>
> Count IV, intentional interference with prospective economic
> advantage and relations.

Compl. [Dkt. 1] ¶¶ 31-141.

In support of these claims, Plaintiffs allege that Defendants have conspired to

entrench market power, to exclude rival candidates, and to undermine competition "in the

presidential debates market, the presidential campaign market, and the electoral politics market

of the two major political parties by exercising duopoly control over presidential and vice

presidential debates in general election campaigns for the presidency."  *Id.* ¶ 1.  Plaintiffs claim

that Defendants intended, and still intend, to exclude rival candidates and impair competition in

these "markets" and to narrow voting choices to the candidates from the two major political

parties at the expense of the electoral process as well as third party and independent candidates.

*Id.* ¶¶ 3-6.  Plaintiffs further allege that the Libertarian and Green Party candidates were excluded from the debates in 2012 "due to hostility towards their political viewpoints."  *Id.* ¶ 1.

Each of the three presidential debates between President Obama and Mitt Romney in 2012 was watched by more than 59 million viewers, and each allegedly excluded Plaintiffs Johnson and Stein by agreement between the Commission, the RNC, the DNC, and party nominees President Obama and Mr. Romney.[2]  *Id.* ¶ 34(m).  The Complaint alleges that the presidential and vice presidential debates have a monetary value of hundreds of millions of dollars.  *Id.* ¶ 34.  Corporate sponsors collectively contribute millions of dollars in each election cycle to the Commission.  *Id.* ¶ 35.  Further, presidential debates generate millions of dollars in revenue for the communities in which they are held.  *Id.* ¶ 37.  Also, the hosts of the debates spend "several millions of dollars in associated direct and indirect costs, including payments of millions of dollars to the Commission."  *Id.* ¶ 38.  For example, for the 2012 presidential debate in Denver, the University of Denver paid the Commission $1.65 million for production fees.  *Id.* Republican and Democratic campaigns spend enormous sums on advertising, rental of office space, staffer salaries, tee shirts, and entertainment.  *Id.* ¶¶ 40-44.  Allegedly, over $2 billion was spent on the 2012 presidential election, including sums expended by the campaigns and third parties.  *Id.* ¶¶ 40, 44.

Plaintiffs contend that televised debates are essential to presidential and vice presidential candidates, providing candidates with free national advertising and allowing them to compete meaningfully and to communicate their message to the electorate.  *Id.* ¶¶ 45-46.  They allege:

---

[2] The Commission accepts the allegations of the Complaint for the purpose of its motion to dismiss, but insists that the Commission is an independent entity that does not act in concert with any political party or candidate.  *See* Comm'n Mot. to Dismiss [Dkt. 40] at 9 n.13.

> To be excluded from the debates is "an electoral death sentence."
> The media gives non-duopoly, non-major party candidates little or
> no coverage, and they cannot afford significant, if any national
> advertising.  Hence, they are denied the free, enormous coverage
> received by the duopoly party candidates through the debates, and
> they are marginalized in the minds of most people in the U.S. and
> the media, and considered to be less than serious, peripheral, and
> perhaps even frivolous candidates.

*Id.* ¶ 46.  Plaintiffs insist that there are no alternative means for national exposure and that

"[e]xclusion from the debates guarantees marginalization, a public perception that the excluded

candidates are 'unserious,' notwithstanding their talent, records, capabilities, alignments with the

views of many, if not most, of American voters, and leadership skills." *Id.* ¶ 47.

      The Commission has sponsored the presidential debates since the League of

Women Voters withdrew in 1988; now it is the sole sponsor of all presidential debates.  *Id.*

¶¶ 52, 65, 69-70, 100.  The Commission allegedly structured the 2012 debates to promote RNC

and DNC candidates and to exclude other candidates, *id.* ¶¶ 58-63, and plans to do so again in all

future debates, *id.* ¶¶ 66-67.[3]

      In each year that presidential debates are held, the Republican and Democratic

campaigns enter into a Memorandum of Understanding (MOU).  *Id.* ¶ 71; *see also* Compl., Ex. 1

(MOU dated Oct. 2012).  In 2012, the MOU was signed by the general counsel to the Obama

campaign and the general counsel to the Romney campaign.  The MOU provided that the

Commission would sponsor the candidates' debate appearances and the candidates would not

appear at any other debate without prior consent of the parties to the MOU. The MOU also

provided that the parties "agreed that the Commission's Nonpartisan Candidate Selection

---

[3] The Complaint acknowledges that Ross Perot was permitted to participate in the presidential
debates in 1992, but refers to this as an aberration, permitted only because the RNC and DNC
believed that Mr. Perot's presence would serve their party interests.  Compl. ¶¶ 70-71.

Criteria for 2012 General Election Debate participation shall apply in determining the candidates to be invited to participate in these debates." *Id*. 73. Those criteria include (1) evidence of "ballot access"—that the candidate qualified to appear on enough State ballots to have a mathematical chance of securing an electoral college majority;[4] and (2) evidence of "electoral support"—that the candidate had the support of 15% of the national electorate as determined by averaging public opinion polls from five selected national polling organizations (the 15% Provision).[5] Compl. ¶ 74.  The Complaint asserts that the 15% Provision was designed to exclude the participation of third party and independent candidates.  *Id*. ¶¶ 75-76, 85-86.  Plaintiffs allege that they have been injured in their "businesses of debating in presidential elections, participating in presidential election campaigns, and engaging in electoral politics."  *Id*. ¶ 90.

Accordingly, Plaintiffs allege that Defendants have colluded to restrain commerce and monopolize the presidential debates, elections, and politics markets by keeping other parties and candidates out of the debates (and thus out of the electoral competition) and by fixing the terms of participation in the debates to avoid challenges to the Republican or Democratic parties and their candidates.  *Id*. ¶ 89 (alleging violation of Section 1 of Sherman Act); *id*. ¶ 104 (alleging violation of Section 2 of Sherman Act).  They further assert that Defendants have

---

[4] In 2012, Mr. Johnson and Ms. Stein were each qualified on enough State ballots to have at least a mathematical chance of securing an Electoral College majority.  Opp'n [Dkt. 45] at 8.  Since the Commission began sponsoring debates in 1998, the following candidates, every one of whom had less than 1% of the popular vote, obtained ballot access in a sufficient number of States to win an Electoral College majority:  Lenora Fulani (1988 & 1992); Andre Marrou (1992); Harry Brown (1996 & 2000); John Hagelin (1996 & 2000); Howard Philips (1996 & 2000); Ron Paul (1998 & 2008); Michael Badnarik (2004); David Cobb (2004); Michael Peroutka (2004); Bob Barr (2008); Chuck Baldwin (2008); Cynthia McKinney (2008); and Virgil Goode (2012).  *See* Election Results 1998-2000, FEC, http://www.fec.gov/pubrec/electionresults.shtml (last visited July 26, 2016).

[5] The MOU does not specify the criteria for selecting the five national polling organizations.

violated the First Amendment by suppressing the viewpoints of third party and independent candidates, *id.* ¶ 120, and by burdening and stifling the right to associate, to vote, to form new political parties, and to support third party and independent candidates, *id.* ¶¶ 122, 123, 128, 130. Finally, they contend that Defendants, through their anticompetitive conduct, intentionally interfered with Plaintiffs' expectations of economic advantages and relationships with debate organizers, sponsors, contributors, and media outlets. *Id.* ¶¶ 134-141.

Plaintiffs seek injunctive relief as well as money damages. They ask for (1) a declaratory judgment that Defendants have engaged in unlawful restraint of trade in the presidential debates, elections, and politics markets in violation of Section 1 of the Sherman Act; (2) a declaratory judgment that Defendants have engaged in monopolization of these same markets in violation of Section 2 of the Sherman Act; (3) treble damages for antitrust violations; (4) a declaratory judgment that the 15% Provision used by Defendants violates the First Amendment and entitles them to damages for such violation; (5) damages for Defendants' tortious interference with prospective business advantage and relations; (6) equitable relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, including an order dissolvingthe Commission to dissolve and an injunction against any further agreement between the RNC and the DNC that would exclude presidential candidates from debates; (7) attorney fees, costs, and interest. Compl. at 46-47 (Relief Requested).

Defendants have moved to dismiss, arguing that Plaintiffs lack standing and that they have failed to state a claim under antitrust law, the First Amendment, or intentional interference. *See* DNC Mot. to Dismiss (MTD) [Dkt. 37]; DNC Reply [Dkt. 47]; RNC MTD [Dkt. 38]; RNC Reply [Dkt. 46]; Romney MTD [Dkt. 39]; Romney Reply [Dkt. 48]; Comm'n

MTD [Dkt. 40]; Comm'n Request for Judicial Notice [Dkt. 41]; Comm'n Reply [Dkt. 49].[6]

Plaintiffs oppose.  *See* Opp'n [Dkt. 45].

## II. LEGAL STANDARD

### A. Standing and Lack of Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides that a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Here, Defendants contend that Plaintiffs lack standing to allege violations of antitrust law and thus Counts I and II should be dismissed for lack of jurisdiction.  A plaintiff must have standing under Article III of the United States Constitution in order for a federal court to have jurisdiction to hear the case and reach the merits.  *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998); *Grand Council of the Crees v. FERC,* 198 F.3d 950, 954 (D.C. Cir. 2000).  Standing is an "irreducible constitutional minimum."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

Because Plaintiffs assert subject matter jurisdiction, they bear the burden of showing that such jurisdiction exists.  *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  When reviewing a motion to dismiss for lack of jurisdiction, a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, a court need not accept factual inferences that are not supported by the facts alleged in the complaint, nor must a court accept a plaintiff's alleged legal conclusions.  *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).  A court may consider materials outside the pleadings to

---

[6] President Obama joined in the DNC briefs; Messrs. Fahrenkopf and McCurry joined in the Commission briefs.

determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

### B.  Failure to State a Claim

Defendants also contend that the Complaint fails to state a claim.  A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must contain sufficient factual information, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A court must assume the truth of all well-pleaded factual allegation and construe reasonable inferences from those allegations in favor of the plaintiff. *Sissel v. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).  Again, a court need not accept a plaintiff's inferences if they are not supported by the facts set out in the complaint, *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), and a court need not accept as true a plaintiff's legal conclusions, *see Iqbal*, 556 U.S. at 678.  In deciding a motion under Rule 12(b)(6), a court may consider the complaint's factual allegations, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

Federal Rule of Evidence 201 provides that a court may judicially notice a fact that is not subject to "reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  A court may take judicial notice of facts contained in public records of other proceedings, *see Abhe*, 508 F.3d at 1059;

*Covad Commc'ns Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005), and of historical, political, or statistical facts, and any other facts that are verifiable with certainty, *see Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.5 (D.D.C. 2010).   Further, judicial notice may be taken of public records and government documents available from reliable sources.   *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012).   For the purpose of this Opinion, the Court takes judicial notice of cited political and statistical facts that the Federal Election Commission has posted on the web.   *See* nn.3 & 6, *supra*.   The Commission's unopposed Request for Judicial Notice [Dkt. 41] will be granted only to the extent that this Opinion cites judicially noticed material.

Plaintiffs argue that their claims are "heavily fact-bound and implicate testimonies from political, economic, and First Amendment experts" and thus "[t]his case is peculiarly unsuited to motions to dismiss."   Plaintiffs rely on commentators and others who hold the opinion that presidential debates should be open to all, or at least more, candidates.   *See* Opp'n at 28-29 (quoting political pundit and commentator George Will, former Senator Oliver North, former Federal Election Commission Chair Scott Thomas, author George Farah, and various journalists).   In support of their reliance on commentators, Plaintiffs misquote *Twombly* as stating that "the Court must assess the plausibility of the Plaintiff's claims based on experience, the considered view of leading commentators, common sense or otherwise."   *See* Opp'n at 28 n.2 (citing *Twombly*, 550 U.S. at 566).   *Twombly* does not so credit all "leading" commentators. *Twombly* requires facts:

> In identifying facts that are suggestive enough to render a [Sherman Act] § 1 conspiracy plausible, we have the benefit of the prior rulings and *considered views of leading commentators*, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

> Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.

*Id.* at 556-57 (emphasis added).  Whether parallel conduct suggests an antitrust conspiracy is not relevant to this case.  *Twombly* in no way suggests that district courts generally should accept commentators' political or social policy opinions as governing a judicial opinion, and this Court will not adjudicate Defendants' motions to dismiss here based on individual opinions regarding what the law should be or how elections and campaigns should operate.  When reviewing a motion to dismiss for failure to state a claim, the Court accepts the *factual* allegations of the Complaint as true, *see Sissel*, 760 F.3d at 4, and need not accept as true a plaintiff's legal conclusions, *see Iqbal*, 556 U.S. at 678.  This Court will follow Supreme Court teachings.

### III. ANALYSIS

#### A. Antitrust Claims

##### 1. Standing Generally

To have Article III standing, a plaintiff must establish: "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).  In *Fulani v. Brady*, 729 F. Supp. 158 (D.D.C. 1990), *aff'd on other grounds*, 935 F.2d 1324 (D.C. Cir. 1991), a court in this district decided the plaintiff had no standing to sue in circumstances similar to those here.  Lenora Fulani was the New Alliance presidential candidate in 1988.  She sued the Secretary of the Treasury and the Commission on Presidential Debates, seeking to revoke the Commission's tax exempt status and either to bar the Commission-sponsored debates or to require the Commission to include her in the debates.  729

F. Supp. at 159-60.  While acknowledging that valuable media exposure and voter recognition is afforded by participation in well-publicized debates, the district court found that Ms. Fulani lacked Article III standing to sue the Commission because she had not alleged an injury that was traceable to the Commission.  The Commission merely coordinated and sponsored the debates. Ms. Fulani's alleged injury, the loss of media exposure and voter recognition, was traceable to media decisions regarding whether to cover the debates or her campaign.  "If the [Commission] held a debate but no one from the media came to cover it then Fulani would be hard-pressed to assert any injury from her exclusion."  *Id*. at 164.

In addition, the district court found that Ms. Fulani's alleged injury was purely speculative:

> [M]edia coverage is dependent upon a number of diverse factors involving the structure and quality of the debates, including the number of candidates participating and the stature of those participating. If all eighty-two candidates for President in 1988 were participants in the debates this Court cannot reasonably infer that the debates would actually be broadcast nationally and that there would be millions of viewers.[7]  Indeed, even assuming that there was media coverage of a debate which involved every fringe party candidate, this Court cannot reasonably infer what practical value, if any, such a political free-for-all would have for the American voters in terms of candidate recognitions or voter education.  Indeed, if such a debate were staged, this Court maintains serious doubt whether major party candidates—who presumably would be the media draw in the first place—would participate.

*Id*. at 163.  Because Ms. Fulani failed to allege a concrete, non-speculative injury traceable to the Commission, she did not have standing under Article III.  *Id*. at 163-164.

---

[7] When Mr. Johnson and Ms. Stein ran for president in 2012, there were over 240 declared candidates for president, excluding those seeking the nomination of a major party.  *See* 2012 Presidential Form 2 Filers, FEC, http://www.fec.gov/press/resources/2012presidential _form2dt.shtml (last visited July 26, 2016).

11

Likewise, Plaintiffs in this case have not alleged a non-speculative injury traceable to the Commission.  In the same vein as Ms. Fulani, Plaintiffs complain that "[t]o be excluded from the debates is an electoral death sentence" and that exclusion from Commission-sponsored debates deprives them of free national advertising that is essential to the Libertarian and Green Party campaigns.  Compl. ¶¶ 45-46.  Plaintiffs' alleged injuries are wholly speculative and are dependent entirely on media coverage decisions.  The alleged injuries—failure to receive media coverage and to garner votes, federal matching funds, and campaign contributions—were caused by the lack of popular support of the candidates and their parties sufficient to attract media attention.  It is obvious that Defendants did not cause Plaintiffs' alleged harms when the sequence of events is examined:  Plaintiffs' injuries occurred *before* Defendants failed to invite them to participate in the 2012 debates because the lack of an invitation was due to Plaintiffs' failure to satisfy the 15% Provision, *i.e.*, the failure to obtain sufficient popular support.  Plaintiffs have not alleged a concrete injury traceable to the Commission, and thus they lack standing.

In Opposition, Plaintiffs claim that they have "competitor standing" to sue.  Opp'n at 39-40.  The doctrine of competitor standing has no bearing on this lawsuit.  The doctrine confers standing when the Government takes action that benefits a plaintiff's competitor to the economic detriment of the plaintiff.  *See Delta Constr. Co., Inc. v. EPA*, 783 F.3d 1291, 1299 (D.C. Cir. 2015); *see State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (the competitor standing doctrine permits a plaintiff to challenge the Government's "under-regulation" of such plaintiff's economic rival).  Because this case does not involve

government action, "competitor standing" is not relevant to Plaintiff's claims.  *See supra*, Section B (finding that there is no state action implicated here).[8]

Without standing, Plaintiffs have not presented a case or controversy under Article III with regard to the antitrust claims.  Dismissal of Counts I and II is warranted due to lack of jurisdiction.

## 2. Antitrust Standing

Further, Plaintiffs have not alleged that they have suffered an antitrust injury and thus they have not alleged antitrust standing.  Antitrust standing requires a plaintiff to show an actual or threatened injury "of the type that the antitrust laws were intended to prevent" that was caused by the defendant's alleged wrongdoing.  *Andrx Pharm. Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 806 (D.C. Cir. 2001).  Antitrust laws were designed to protect competition, not competitors.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  A plaintiff must allege "anti-competitive effects resulting from [the defendant's] actions; absent injury to *competition*, injury to a plaintiff as a *competitor* will not satisfy this pleading requirement."  *Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 683 (D.D.C. 1984) (emphasis in original).  "[A] plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Broad allegations of harm to the "market" as an abstract entity do not adequately allege an antitrust injury.  *Id.* at 339 n.8; *see Asa Accugrade,*

---

[8] *See Buchanan v. Federal Election Comm'n*, 112 F. Supp. 2d 58, 74-75 (D.D.C. 2000) (third party presidential candidate Pat Buchanan sought to participate in Commission-sponsored debates with "competitor standing" to challenge FEC's dismissal of his complaint; even so, the district court affirmed the FEC's dismissal because the 15% Provision was objective, reasonable, and not subject to restrictions imposed by the Federal Election Campaign Act, 2 U.S.C. § 431 *et. seq*.).

*Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 216 (D.D.C. 2005) (failure to allege facts

beyond a conclusory statement that "the market as a whole suffered anti-competitive injury," is

fatal to a Sherman Act claim).  Critically, "neither the business of conducting the government

nor the holding of a political office constitutes 'trade or commerce' within the meaning of the

Sherman Act."  *Sheppard v. Lee*, 929 F.2d 496, 498 (9th Cir. 1991).

   The Complaint alleges Plaintiffs were harmed through loss of publicity, campaign

contributions, and salaries the individual candidate Plaintiffs would have received as President or

Vice President.  Compl. ¶ 92.  Harm to individuals is not antitrust injury.  Antitrust claimants

must allege harm to competition, *see Mizlou*, 603 F. Supp. at 683, or harm to a market, *see*

*Brunswick*, 429 U.S. at 488.  Plaintiffs do allege that presidential debates, elections, and politics

are "markets" that are harmed by Defendants' failure to invite Plaintiffs to participate in the

presidential debates.  *Id*. ¶¶ 1, 89-90.  But calling political activity a "market place" does not

make it so.  Plaintiffs make no attempt to define what they mean by presidential debates,

elections, and politics "markets."  Their vague reference to "markets" is insufficient to allege

injury to competition in any particular market.  *See Atlantic Richfield*, 495 U.S. at 339 n.8.  As

with holding political office, running for political office is not "commerce" under antitrust law.

*See Sheppard,* 929 F.2d at 498.  Because they have failed to assert an antitrust injury, Plaintiffs

lack antitrust standing.  For this reason as well, Counts I and II will be dismissed.

### 3. Failure to Allege Injury to a Commercial Market

   Moreover, Plaintiffs' failure to allege injury to competition in a commercial

market constitutes a failure to state an antitrust claim.  Counts I and II attempt to allege restraint

of trade and monopoly in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

The Sherman Act regulates markets.  To state a § 1 claim, a plaintiff must allege (1) an antitrust

injury to the relevant market that also injured plaintiff; (2) defendants entered into some

agreement, (3) the agreement either did or was intended to restrict trade unreasonably in the

relevant market, and; (4) it affected interstate commerce. *Asa Accugrade*, 370 F. Supp. 2d at

215.  To state a § 2 claim, a plaintiff must allege facts showing the acquisition or maintenance of

monopoly power in the relevant market through willful exclusionary conduct. *See United States

v. Microsoft,* 253 F.3d 34, 50 (D.C. Cir. 2001).  Plaintiffs bear the burden to plead a relevant

market for their Sherman Act claims. *See Meijer, Inc. v. Barr Pharms., Inc*., 572 F. Supp. 2d 38,

53 (D.D.C. 2008).

       The Sherman Act is aimed at business combinations with commercial objectives.

*Klor's, Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207, 213 (1959).  "[A]ntitrust laws regulate

business, not politics . . . ." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 383

(1991).  When a case involves political opponents and political objectives, not commercial

competitors or market place goals, antitrust laws do not apply. *Counsel for Emp. & Econ.

Energy Use v. WHDH Corp*., 580 F.2d 9, 12 (1st Cir. 1978); *see also Eastern R.R. Presidents

Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127, 140-41 (1961) (exempting

anticompetitive restraints arising from efforts to influence governmental action; the Sherman Act

"condemns trade restraints, not political activity").  Plaintiffs claim that the presidential debates

constitute "commerce" regulated by antitrust law because of the incidental economic impact of

debates, *i.e*., the monies spent on debate sponsorship fees, the revenues earned by debate hosts,

the sales of t-shirts and other campaign paraphernalia.  Plaintiffs also attempt to amend their

Complaint by alleging in their Opposition a new type of injury: reduction of voter education

output.  Opp'n at 41.  It is unclear what, precisely, "voter education output" might be, but it

appears to refer to ideas, not products or services that are traded in a commercial marketplace,

and thus this claim does not allege a cognizable antitrust injury.  *See DataCell ehf v. Visa, Inc.*,

No. 1:14-cv-1658, 2015 WL 4624714, at *7 (E.D. Va. July 30, 2015) ("If the products in

DataCell's markets are ideas, then the antitrust laws cannot help DataCell.  Congress created

antitrust laws to protect free market competition, not to protect the free exchange of ideas.")

  The Supreme Court has soundly rejected assertions like those advanced by

Plaintiffs.  "Antitrust laws should not regulate political activities simply because those activities

have a commercial impact."  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492,

507 (1988) (internal quotation marks and citation omitted).  Plaintiffs' claims are based on

competition among candidates for political office.  Without doubt, Presidential debates are

quintessential political activities.  While Plaintiffs point to the millions of dollars that campaigns

spend on elections and the revenue generated by communities that host debates, such incidental

commercial activity does not convert the debates and campaigns from political to commercial

activity.

  Plaintiffs also contend that the Sherman Act applies to political activity because

there is no express exception for political activity in the statute.  Opp'n at 6, 35.  Plaintiffs' logic

is faulty.  The Sherman Act expressly applies only to restraints of "trade or commerce."

Congress did not need to include an exception for political activity because the statutory

language does not include political activity in the first place.

  Indeed, courts have repeatedly rejected attempts to impose the antitrust laws on

political conduct.  In *Council for Emp't & Econ. Energy Use v. WHDH Corp.*, 580 F.2d 9 (1st

Cir. 1978), the First Circuit affirmed the district court's dismissal of an antitrust claim against

broadcasters who provided free air time to the plaintiff's political opponent.  The First Circuit

emphasized that the case involved political opponents and political objectives, not commercial

competitors and marketplace goals, and that "access to the public media by expressly political organizations for the purpose of influencing political decisions of the general electorate" was not within the scope of the Sherman Act.  *Id*. at 12.  In *Sheppard v. Lee*, 929 F.2d 496 (9th Cir. 1991), a plaintiff claimed that defendants violated the antitrust laws by firing plaintiff when he declared his candidacy for a position on the county board of supervisors.  The Ninth Circuit upheld the dismissal of the Sherman Act claim because "antitrust laws post no barriers to the suppression of competition for the holding of any particular office or position, elected or otherwise . . . ."  *Id*. at 499-500.

Moreover, this Court could not require Defendants to include Plaintiffs in the debates because such an order would violate the First Amendment prohibition on forced speech and forced association.  "[T]he freedom to associate for the 'common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only."  *Democratic Party v. Wisconsin*, 450 U.S. 107, 122 (1981).  That is, freedom of association "plainly presupposes a freedom not to associate."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  The Supreme Court has stated clearly and often that the First Amendment freedom of speech includes the right to speak freely *and* the right to refrain from speaking.  *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  "The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas" and "[t]here is necessarily . . . a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985) (citation omitted; emphasis in orginal).

For example, the Supreme Court has rejected "right of access" laws.  In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), a newspaper had attacked the character and record of a political candidate and a "right of reply" statute required the paper to print the candidate's response.  *Id*. at 244.  The Supreme Court held that the statute violated the First Amendment because the government could not coerce the press into printing the candidate's reply.  *Id*. at 256-58.  Relying on *Tornillo*, in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995), the Court held that veterans could exclude a gay group from the veterans' privately-organized parade.  The veterans planned to convey their own political message and the First Amendment forbade the court from mandating that they alter the expressive content of the parade by including the homosexual group's message.  *Id*. at 572-73. *See also Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) (rejecting claim by third party candidate who sought to be included in Commission debates, and opining that "if the court were to enjoin the [Commission] from staging the debates or from choosing debate participants, there would be a substantial argument that the court would itself violate the [Commission's] First Amendment rights"); *Sistrunk v. City of Strongville*, 99 F.3d 194, 199-200 (6th Cir. 1996) (the Bush campaign and the City of Strongville did not violate a plaintiff's First Amendment right by denying her admission to a campaign rally on public property, as the rally organizers had a First Amendment right to hold a rally "without having to tolerate simultaneous discordant statements" and plaintiff had other avenues of expression).[9]

---

[9] Plaintiffs mistakenly assert a right to participate in the debates in light of *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980) (upholding a right to protest in a private shopping center). *PruneYard* has no application here, as its holding was based on broad rights provided by the California Constitution.  The U.S. Constitution, not the California Constitution, is at issue here.

In support of their claim that the Sherman Act requires Defendants to include Plaintiffs in the presidential debates, Plaintiffs point to *Rumsfeld v. Forum for Academic & Institutional Rights (FAIR), Inc.*, 547 U.S. 47 (2006). In *Rumsfeld*, the Supreme Court held that the military could recruit on law school campuses. The Court explained that this did not impinge on First Amendment rights because the school's decision to permit recruiters on campus was not "inherently expressive" and that the "schools are not speaking when they host interviews and recruiting receptions." *Id.* at 49. *Rumsfeld* is inapposite, as Defendants' decisions regarding whether to sponsor a debate and who participates constitute political speech, protected by the First Amendment. *See Hurley*, 515 U.S. at 575 (choice not to include a group in a parade is protected by the First Amendment).

## B. First Amendment Claim

Plaintiffs allege that Defendants have violated their right to free speech and free association by excluding them from the presidential debates. It is fundamental that the First Amendment binds only the actions of the Government and does not apply to actions of private persons or entities. *Pub. Utilities Comm'n v. Pollak,* 343 U.S. 451, 461 (1951); *Granfield v. Catholic University of Am.,* 530 F.2d 1035, 1046-47 (D.C. Cir. 1976); *Nat'l Conservative Political Action Comm. (NCPAC) v. Kennedy*, 563 F. Supp. 622, 626 (D.D.C. 1983), *aff'd*, 729 F.2d 863 (D.C. Cir. 1984). The First Amendment "provides no protection against private behavior, no matter how egregious." *Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997).

Previously, the Natural Law Party and third party candidate Ross Perot brought a First Amendment claim against the Commission. *See Hagelin v. FEC*, Case Nos. 96-2132 & 96-2196 (THH), 1996 WL 566762 (D.D.C. Oct. 1, 1996), *aff'd on other grounds sub nom. Perot v. FEC*, 97 F.3d 553 (D.C. Cir. 1996). There, the plaintiffs advanced statutory and constitutional

claims and sought a preliminary injunction prohibiting the Commission from using certain selection criteria in choosing which candidates would appear at the presidential debates.  The district court denied the injunction, finding that there was no likelihood of success on the merits on any of plaintiffs' claims; with regard to the constitutional claims, the Court emphasized that there was no evidence that the Commission was a state actor.  *Id*. at *6.

   Plaintiffs expressly concede that Defendants are not government actors.  *See* Opp'n at 48.  Plaintiffs do not make claims against the individual defendants in their official capacities and they do not sue them as state actors. They allege that President Obama and Mr. Romney are liable as individuals because they entered into "collusive agreements" during the 2012 election to sustain the Commission's "monopoly" over presidential debates.  *See* Compl. ¶¶ 29-30.  President Obama is sued for his actions as a candidate, not for any actions he took as President.  Similarly, Plaintiffs' allegations against Messrs. Fahrenkopf and McCurry are claims against them in their individual capacities.  Plaintiffs contend that Mr. Fahrenkopf collaborated to take the debates from the League of Women Voters and to dictate the terms of the debates creating the RNC and DNC's "duopoly," *id*. ¶ 27, and that Mr. McCurry actively participated in the "monopoly arrangement" between the RNC, the DNC, the Commission, and the candidates, *id*. ¶ 28.

   Plaintiffs seek to expand the law broadly by arguing that Defendants should be treated as government actors because they sponsor presidential debates that "perform the same historical role that public parks or comparable venues did in educating the public about politics and candidates," *i.e.*, the debates function as a "surrogate public park."  Opp'n at 49.  Plaintiffs reason that Defendants should be treated as government actors like a private party who controls a company town, citing *Marsh v. Alabama*, 326 U.S. 501 (1946).  *Marsh* is not analogous.  There,

the Supreme Court upheld the right to leaflet in a company town because the private party

controlled the entire town and all "essentially public forums." *Columbia Broad. Sys., Inc. v.*

*Democratic Nat'l Comm.*, 412 U.S. 94, 134 (1973) (discussing *Marsh*).  Here, Defendants have

not assumed the attributes of a municipality and do not control all public areas.  In contrast to the

operation of a town (ordinarily a public function), the hosting of a political debate is not a public

function "because the First Amendment protects private parties' rights to put on (and select the

content of) debates." *DeBauche v. Trani*, 191 F.3d 499, 509 (4th Cir. 1999).  Moreover, just

because a private party performs a public function does not necessarily mean the private entity

becomes a state actor.  *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S.

522, 544 (1987) (the U.S. Olympic Committee serves the public by coordinating athletics, but it

is not a government actor).  The fact that Defendants serve the public by coordinating

presidential debates does not make their actions "state action" for purposes of the First

Amendment.

Even when televised debates are hosted by a state actor, courts have held that

such debates do not constitute a "public forum" to which there is a First Amendment right of

access.  *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 669, 677-82 (1998).  In

*Forbes*, a state agency owned and operated a television network that hosted debates.  The

Supreme Court found that the state agency did not violate the First Amendment when it excluded

from a televised debate an independent candidate for Senate whom it believed had insufficient

support to be considered a "serious" contender for office.  *Id*. at 682-83.  "[T]he debate was a

nonpublic forum, from which [the agency] could exclude Forbes in the reasonable, viewpoint-

neutral exercise of its journalistic discretion." *Id*. at 676.  *See also Chandler v. Georgia Public*

*Telecomm. Comm'n*, 917 F.2d 486, 489 (11th Cir. 1990) (a state agency "chose to air a debate

between only the Democratic and Republican candidates because it believed such a debate would be of the most interest and benefit to the citizens of Georgia.  Such a decision promotes [the agency's] function, was 'reasonable' and was 'not an effort to suppress expression merely because public officials oppose the speaker's view."); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (a state may deny candidates ballot access for failure to reach a significant modicum of voter support).  Plaintiffs view themselves as champions of the public interest, insisting that open debates necessarily promote democracy.  However, the Supreme Court in *Forbes* evaluated a demand for debate access more realistically, noting:

> Were it faced with the prospect of cacophony, on the one hand, and First Amendment liability, on the other, a public television broadcaster might choose not to air candidates' views at all. A broadcaster might decide the safe course is to avoid controversy, and by so doing diminish the free flow of information and ideas.  In this circumstance, a government–enforced right of access inescapably dampens the vigor and limits the variety of public debate.

*Forbes*, 523 U.S. at 681 (internal citations and quotations omitted).  Because Plaintiffs fail to allege facts demonstrating government action, the First Amendment claim will be dismissed.

Taking another tack, Plaintiffs argue the Defendants' monopoly over the presidential debates is similar to the Jaybird Party primaries invalidated in *Terry v. Adams*, 345 U.S. 461 (1953), because of the importance of the debates in presidential elections.  In *Terry*, a private political party called the "Jaybird Party" held racially-restrictive primary elections that excluded African-Americans.  The Court treated the Jaybird Party as a state actor, and found that "[i]t violates the Fifteenth Amendment for a state, by such circumvention, to permit within its borders the use of any device that produces an equivalent of the prohibited election." *Id*. at 469. Plaintiffs insist that the Commission-sponsored debates exert an influence on elections comparable to the influence of the Jaybird Party's private club elections for county-wide elections in Texas and that "[j]ust as candidates who failed to prevail in the Jaybird Party's

'private club' elections were, in light of proven political realities, guaranteed to lose in official county-wide races, a presidential candidate who is excluded from presidential debates has zero chance of winning the general presidential election."  Compl. ¶ 111.

The D.C. Circuit has considered and rejected this very claim in *Johnson v. FCC*, 829 F.2d 157 (D.C. Cir. 1987).  The Circuit held that the plaintiffs "stated no legally cognizable claim to participate in the broadcast debates."  *Id*. at 162.  The Circuit expressly distinguished *Terry* because that case was "concerned with banishment of candidates and voters from the political arena, not with overcoming disadvantages in money and image frequently encountered by minor-party candidates."  *Id*. at 165.  Unlike *Terry*, the exclusion of petitioners from the presidential debates in *Johnson* "did not prevent them from waging an effective campaign or deny voters the opportunity to exercise their First Amendment rights by casting their votes for petitioners" because "petitioners were able to gain ballot access in nineteen states, qualify for public campaign financing, and receive enough votes to finish fifth in the field of 228 presidential candidates."  *Id*. at 165.  Further, the exclusion of the *Johnson* petitioners from the debates did not "exclude them altogether from television campaigning . . . [because] as much as any candidate they were entitled to purchase advertising time at the lowest available rates."  *Id*.

Further, based on a misapprehension of law, Plaintiffs claim that "Defendants acted pursuant to a judicially enforceable MOU, which is analogous to the racially restrictive private covenants outlawed in *Shelley v. Kramer*, 334 U.S. 1 (1948)."  Opp'n at 49-50.  The Court in *Shelley* did not "outlaw" restrictive covenants but instead found that they were not enforceable by the courts because to do so would constitute unconstitutional state action.  334

U.S. at 844-47.  *Shelley* simply does not apply, as no party here asks this Court to enforce the MOU.[10]

### C. Claim for Intentional Infliction With Prospective Economic Advantage/ Relations

Under D.C. law, the elements of a claim for tortious interference with prospective economic advantage are (1) the existence of a valid business relationship or other expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference causing termination of the relationship or expectancy or causing a failure of performance by one of the parties; and (4) resultant damage.  *McNamara v. Picken*, 866 F. Supp. 2d 10, 15 (D.D.C. 2012) (describing D.C. law); *see also Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995).[11]  A plaintiff must allege "business expectancies, not grounded on present contractual relationships, but which are commercially reasonable to expect."  *McNamara*, 866 F. Supp. 2d at 15 (quoting *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999); *see also McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) (citing *Carr v. Brown*, 395 A.2d 79 (D.C. 1978)).  "A valid business expectancy requires a probability of future contractual or economic relationship and not a mere possibility."  *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) (describing D.C. law; finding that an imagined economic gain from a nonexistent business is mere speculation).

---

[10] The Obama campaign and the Romney campaign are the sole parties to the MOU.  They are not parties in this case and have not sought judicial enforcement of the MOU.

[11] Note that a plaintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships.  *Marshall v. Allison*, 908 F. Supp. 2d 186, 202 (D.D.C. 2012), *aff'd*, 554 F. App'x 20 (D.C. Cir. 2014).  Because this case is at the pleading stage, the Court focuses on the question of whether the Plaintiffs have stated a claim, not on whether the Plaintiffs could prove liability.

A plaintiff must plead the existence of a valid business expectancy with specificity.  *Command Consulting Grp., LLC v. Neuraliq, Inc.*, 623 F Supp. 2d 49, 53 (D.D.C. 2009) ("[T]he claimant's failure to plead the existence of a valid business expectancy requires dismissal of the claim."); *Sheppard*, 59 F. Supp. 2d at 34 (plaintiff's failure to identify facts demonstrating future business relations or to allege any specific future business relationship required dismissal of the intentional interference claim).  In order to state a claim, a plaintiff also is required to plead affirmative, intentional acts of interference.  *See Benedict v. Allen*, No. 00-1923 (CKK), 2001 U.S. Dist. LEXIS 26293, at *21-23 (D.D.C. June 14, 2001).  Mere refusal to deal is insufficient.  Restatement (Second) of Torts § 766 comment b (1999).  The Restatement (Second) of Torts explains further:

> Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability. One may not, however, intentionally and improperly frustrate dealings that have been reduced to the form of a contract.  There is no general duty to do business with all who offer their services, wares or patronage; but there is a general duty not to interfere intentionally with another's reasonable business expectancies of trade with third persons, whether or not they are secured by contract, unless the interference is not improper under the circumstances.

Restatement (Second) of Torts § 766 comment b.

Plaintiffs make only bare bones allegations of intentional interference:

> 134. Defendants' anticompetitive, exclusionary conduct as described herein gives rise to common law liability for intentional interference with prospective economic advantage and prospective contractual or business relations.

> 135. At all relevant times, Plaintiffs had legitimate expectations of economic relationships with third parties, including presidential debate organizers and sponsors, contributors, and media outlets.

> 136. The prospective relationships would have provided economic and other benefits to Plaintiffs but for Defendants' tortious and anticompetitive exclusionary conduct.

137. At all relevant times, Defendants knew of Plaintiffs' prospective contractual and economic relationships with third parties, as well as with the Commission but for the exclusionary conduct and demands of the RNC, DNC, and the individual defendants.

138. Defendants willfully engaged in unlawful, anticompetitive, and exclusionary acts and practices with the intent to disrupt Plaintiffs' prospective contractual and economic relationships.

139. The foregoing acts and practices, and the continuing course of the RNC's, DNC's, the Commission's and Fahrenkopf's anticompetitive and tortious conduct, deliberately and directly resulted in the interference with Plaintiff[s'] prospective contractual and business relations.

140. The foregoing acts and practices, and the continuing course of Defendant's anticompetitive and tortious conduct, directly and proximately caused Plaintiffs to suffer injury and damages to their business and property.

141. Defendants RNC, DNC, the Commission and Fahrenkopf committed these tortious acts with deliberate and actual malice, ill-will, and specific knowledge that their actions constituted an outrageous, willful and wanton disregard of Plaintiff[s'] legal rights.

Compl. ¶¶ 134-141. Because these allegations are devoid of specifics, the Complaint fails to

state a claim for intentional interference. *See Command Consulting*, 623 F Supp. 2d at 53;

*Sheppard*, 59 F. Supp. 2d at 34. Nor have Plaintiffs pled affirmative, intentional acts of

interference. *See Benedict*, 2001 U.S. Dist. LEXIS 26293, at *21-23. The claim that Defendants

would not permit the Libertarian and Green party candidates to be part of the presidential debates

is a "refusal to deal" allegation, one that is insufficient to plead an intentional interference claim

as a matter of law. *See* Restatement (Second) of Torts § 766 cmt. b.

In their opposition to the motions to dismiss, Plaintiffs failed to counter

Defendants' argument that the intentional interference claim was insufficiently specific. *See*

Opp'n at 54-55 (restating the general and vague allegations of the Complaint). "It is well

understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd,* 98 F. App'x. 8 (D.C. Cir. 2004). In essence, Plaintiffs have conceded the issue. The tortious interference claim will be dismissed.

## IV. CONCLUSION

For the reasons stated above, the Commission's unopposed Request for Judicial Notice [Dkt. 41] will be granted in part and denied in part. It will be granted only to the extent that the Court expressly cited judicially noticed material in this Opinion. Further, the motions to dismiss [Dkts. 37, 38, 39, 40] will be granted and this case will be dismissed. Plaintiffs' motion for hearing [Dkt. 50] will be denied as moot. A memorializing Order accompanies this Opinion.


Date: August 24, 2016                                    _____/s/_____
                                                         ROSEMARY M. COLLYER
                                                         United States District Judge